# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Bowman*, 2012 IL App (1st) 102010

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KENDALL BOWMAN, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-10-2010 |
| Filed | June 15, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The appellate court upheld defendant's convictions for aggravated battery of a child and aggravated battery with a firearm in an appeal involving the shooting of a 10-year-old bystander in an encounter between defendant and his intended victim, since defendant forfeited his contention that he was denied the right to present evidence of his intended victim's aggressive and violent character in support of his claim of self-defense, the plain-error doctrine did not apply, and defendant's right to due process was not violated when a defense witness had to testify in jail attire. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 05-CR-24234; the Hon. Victoria Stewart, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part; cause remanded. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Christopher Kopacz, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary Needham, and Marci Jacobs, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE McBRIDE delivered the judgment of the court, with opinion.

Justices J. Gordon and Howse concurred in the judgment and opinion.

**OPINION**

¶ 1 Following a jury trial, defendant, Kendall Bowman, was found guilty of aggravated battery of a child and aggravated battery with a firearm and sentenced to 50 years' imprisonment. On appeal, defendant contends that: (1) the trial court denied his right to present relevant evidence to support his claim of self-defense; (2) the trial court violated his right to due process when it compelled a defense witness to testify while wearing jail attire; and (3) the court relied upon an improper aggravating factor when imposing his sentence. For the reasons that follow, we affirm.

¶ 2 Defendant was arrested and charged by indictment with attempted first degree murder, aggravated battery of a child and aggravated battery with a firearm in connection with the shooting of 10-year-old Deiija Hamilton. The following evidence was presented at defendant's trial.

¶ 3 Deiija Hamilton, who was 14 years old at the time of trial, testified that on July 7, 2005, she lived in the LeClaire Courts housing projects in Chicago, Illinois. On that date, at 11:49 a.m., Hamilton was walking home from camp with her sister when she saw defendant standing on the side of a building holding a gun in his hand. Hamilton explained that she knew defendant as "Kendall" and she had known him her entire childhood because he was friends with her mother and he used to hang around her neighborhood. Defendant was approximately 50 feet away from Hamilton and she did not see anyone else standing in that area. When Hamilton saw defendant, she and her sister began to run home. Hamilton looked back toward defendant as she was running and she saw him raise the gun and point it in her direction. Then she felt her legs begin "to burn." She testified that she did not see anyone else in the area at that time. She made it to her house and fell on a mattress near the front door. Hamilton was taken by an ambulance to a nearby hospital, where it was determined that she sustained a gunshot wound to her right calf that went through and grazed her left calf.

¶ 4 Hamilton testified that at the hospital, she told her mother and detectives that "Kendall" was the person who shot her. She did not know Kendall's last name at that time. Sometime later that day, detectives returned to the hospital and showed Hamilton a photo array. She identified a photograph of defendant as the person she knew as "Kendall."

-2-

¶ 5        Hamilton remained in the hospital overnight and on the following day defendant came to her room with balloons and a card. Her mother was in the room at the time and defendant said to her, "I'm sorry. I'm sorry. I was not trying to shoot your daughter. I was trying to shoot the other guy." When asked if she recalled defendant stating whether he was shooting at the other man because that person had shot him before, Hamilton replied yes.

¶ 6        On cross-examination, Hamilton testified that she did not remember telling her mother that she did not think defendant was trying to shoot her and that he was trying to shoot a man named "Jed." She testified that she did know a man named Jed from the neighborhood. When asked if Jed was an aggressive and violent person, the State objected and the trial court sustained the objection. The court also sustained the State's objection when defense counsel asked Hamilton if her mother told police that Hamilton believed that defendant was attempting to shoot Jed. Hamilton testified that she did not tell anyone that she saw Jed on the street at the time of the shooting.

¶ 7        On redirect, Hamilton testified that she did not see Jed on the street on the day she was shot by defendant.

¶ 8        Barbara Walsh, Hamilton's mother, testified that she was present when Hamilton entered the house on July 7 screaming that she had been shot. Later that day at the hospital, Walsh asked Hamilton if she saw the person who shot her. Hamilton said that she did and her mother asked her to describe that person. Hamilton described him as tall and dark-skinned. Walsh asked if Hamilton could tell her the person's name, and Hamilton said no. She then said, "oh, remember we used to go to Linda's house" and "he used to be with Curley." Walsh asked her daughter if she meant "Kendall," and Hamilton said, "yeah, that's who shot me." Walsh explained that Kendall was someone she knew who spent time with someone named Curley and that they used to hang around with "Linda," who lived next door to Walsh. Walsh testified that she did not know Kendall's last name at that time. She gave a detective the name Kendall.

¶ 9        Walsh went home to check on her other children but returned to the hospital later that day and remained there overnight. The following day, July 8, she was in her daughter's room when defendant entered the room and said, "I am sorry for shooting your daughter. I was trying to shoot at someone else before–that he shot me before." Defendant was in the room for less than five seconds and then left. One week later, Walsh was contacted by police and asked to bring her daughter to the police station to view a physical lineup. She refused, however, because she was scared. She did not remember her daughter telling her that defendant was shooting at Jed.

¶ 10        Detective William Proctor testified that he and his partner were assigned to the case. During an interview at the hospital, Hamilton told the detectives that she was shot by Kendall, whom she knew from the neighborhood. Hamilton did not know that person's last name. Detective Proctor and his partner proceeded to the LeClaire Court's security office and determined that Kendall lived in the neighborhood and that his last name was Bowman. The detective identified this person as defendant. The detectives returned to the police station and assembled a photo array of six photographs. The detectives returned to the hospital and showed the array to Hamilton, who identified defendant as Kendall and the person who shot her. The detective spoke with defendant at the police station on July 14, and defendant told the detective that he "did not mean" to shoot Hamilton.

¶ 11    The State also presented evidence regarding the recovery and examination of shell casings from the scene. Officer William Purvis testified that he was the evidence technician assigned to the case. He stated that he recovered four empty 9-millimeter shell casings and two live 9-millimeter shells from the scene. Dustin Johnson testified as a firearms expert from the Illinois State Police crime lab. He examined the recovered evidence and determined that all of the shell casings were fired from the same firearm.

¶ 12    Doctor Thomas Widell testified that he treated Hamilton in the emergency room after she was shot. He stated that she suffered "a through and through injury" to the posterior of her right calf and a graze wound to her left calf.

¶ 13    Defendant testified on his own behalf. He stated that he had received information that a man, Kevin Whitaker, had been given a gun and was being admitted into a gang. Defendant knew Whitaker from playing basketball. On July 7, 2005, he went to talk to Whitaker. When he found Whitaker, they discussed Whitaker's gang involvement. Defendant decided to take the gun given to Whitaker and return it to an individual called "Jed." Jed's full name is Jesse Knighton.

¶ 14    A friend drove defendant to the area where Knighton lived. When he saw Knighton, he got out of the car and approached Knighton and another man, "Mr. Williams." Defendant testified that he was "a little angry." Defendant told Knighton that he wanted to have a word with him. Defendant stated that they talked about why Knighton was "trying to recruit people." Defendant said that Knighton became "real aggressive."

¶ 15    Defendant testified that Knighton told him "to stay the 'F' up out of his business and that he was going to 'F' [him] up." Defendant stated that Knighton started to reach for a gun in his waistband. In response, defendant "discharged" the gun he had. Defendant said he believed that Knighton was going to shoot him and Knighton was "fittin' to 'F' me up like he said." Defendant "discharged one shot to the ground" to scare Knighton away. At this point, Knighton had pulled his gun out. Defendant said he then fired one shot, but did not intend to shoot Knighton. He then fired "maybe like two more shots" into the air to scare Knighton. Defendant stated that Knighton ran away from him and then defendant ran in the other direction. Defendant testified that his intention in firing the gun was to scare Knighton "in defense" of himself.

¶ 16    Later, defendant received a call from a friend who told defendant that a little girl had been shot. He heard it was Barbara Walsh's daughter and the little girl did not "deserve that." He went to the hospital to inform Walsh that he "accidently shot her daughter and that [he] wanted her to know that [he] was sorry and that [he] didn't try to do it and that [he] was deeply sorry." Defendant testified that he did not intend to shoot Hamilton, but he shot the gun to defend himself.

¶ 17    On cross-examination, defendant testified that Whitaker was not a family member or a good friend, but Whitaker "was a guy that [defendant saw himself] trying to guide into the right way." Defendant admitted that the conversation took place near the food site in the housing project between 10 a.m. and noon, but he disagreed that it was lunch time.

¶ 18    When defendant approached Knighton on the street, defendant said the gun was in his jacket pocket. At the start of the conversation, defendant stated, his hands were at his side, but during the conversation, he put both of his hands in his jacket pockets. Defendant denied

that he was angry when he approached Knighton, but said that he was "pissed off." He testified that Knighton had a chrome revolver in his waistband. Defendant was unsure if Knighton ever fired his gun. He did not see Knighton fire a gun in his direction. Defendant stated that Knighton did not know defendant had a gun because the conversation did not make it to that point. When asked by the prosecutor if he fired five shots, defendant said, "maybe."

¶ 19      Defendant testified that did not deny shooting Hamilton. He admitted to visiting Hamilton in the hospital on July 8 and telling Walsh what happened. However, defendant denied telling Walsh that he was trying to shoot the other man who had previously shot him. Defendant also denied speaking with the police and telling them that he did not mean to shoot Hamilton.

¶ 20      Pierre Williams testified for the defense. Williams admitted that he had a prior conviction for a "possession case."

¶ 21      On July 7, 2005, Williams stated that at around 11:30 a.m. or noon, he was walking with Jesse Knighton. He knew Knighton from the neighborhood. They were walking near 44th and Lamon in the LeClaire Courts. At one point, they encountered defendant. Defendant walked up to them and asked to speak with Knighton about giving kids in the neighborhood a gun. Knighton told defendant to stay out of his business, but defendant said no, he wanted to talk to Knighton. Williams stated that Knighton "didn't like it very well" and told defendant that Knighton was "going to 'F' him up." Williams understood that to mean "mess him up."

¶ 22      Williams stated that he knew Knighton to carry a gun and that Knighton was carrying a gun that day. Williams said Knighton had a black revolver. During the conversation with defendant, Williams saw Knighton reaching for the gun from his waistband. Williams testified that defendant was trying to hand the gun to Knighton when he walked up, but when Knighton started to reach for his gun, defendant fired the gun. At that point, Williams turned and ran. He heard another shot as he was running. Williams hid behind a car and saw defendant fire another shot in the air. He said defendant fired a total of four to five shots. During the shooting, Knighton and defendant ran in opposite directions.

¶ 23      On cross-examination, Williams stated that defendant approached them with his hands extended in front of him with a gun in his hands. Williams said he remained hidden behind a car for 5 to 10 minutes, but denied being present when the police arrived at the scene. Williams admitted that he never spoke to police or any law enforcement official about what he saw that day and that his testimony was the first time he told anyone about the events.

¶ 24      The defense rested after Williams' testimony. In rebuttal, the State presented certified copies of defendant's prior convictions for possession of a controlled substance and aggravated robbery. Following deliberations, the jury found defendant not guilty of attempted first degree murder and guilty of aggravated battery of a child and aggravated battery with a firearm.

¶ 25      At the subsequent sentencing hearing, the trial court heard evidence in aggravation and mitigation. The court then imposed a sentence of 25 years for the aggravated battery of a child conviction and merged the aggravated battery with a firearm into that conviction. The court also sentenced defendant to a 25-year enhancement. The court stated that the

enhancement was based on the fact that the victim was a child under the age of 12. Defendant filed a motion to reconsider his sentence. At the hearing on the motion, defendant asked the judge to reconsider the enhancement based on the age of the child. The prosecutor noted, "rather than the firearm being personally discharged by the defendant." The trial judge responded that the enhancement was based on "[b]oth of them" because "the enhancer allows it because of her age and because a firearm is used." The judge then denied defendant's motion.

¶ 26        This appeal follows.

¶ 27        Defendant first argues that he was denied his right to present evidence supporting his claim of self-defense. Specifically, defendant claims that the court improperly excluded evidence of Jesse "Jed" Knighton's aggressive and violent character, pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984).

¶ 28        The State responds that defendant has forfeited this challenge by failing to specifically raise this issue in his posttrial motion. The issue was not raised in his written motion for a new trial, but defendant responds that the issue was raised orally at the hearing on his motion. At that hearing, defense counsel argued that the trial court exhibited bias when it sustained the State's objection with no basis "and Jed was needed for our self-defense argument as spelled out in *Lynch*." This assertion is not the same issue presented on appeal. Defendant did not argue that he was deprived of his right to present evidence of self-defense, but instead only asserted that the trial court showed a bias against defendant such that defendant did not receive a fair trial. Defendant did not specifically challenge the court's evidentiary rulings. To preserve an issue for review, defendant must object both at trial and in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Failure to do so operates as a forfeiture as to that issue on appeal. *People v. Ward*, 154 Ill. 2d 272, 293 (1992).

¶ 29        Defendant, however, asks this court to review this issue as plain error. Supreme Court Rule 615(a) states that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). The plain error rule "allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)). However, the plain error rule "is not 'a general saving clause preserving for review all errors affecting substantial rights whether or not they have been brought to the attention of the trial court.' " *Herron*, 215 Ill. 2d at 177 (quoting *People v. Precup*, 73 Ill. 2d 7, 16 (1978)). Rather, the supreme court has held that the plain error rule is narrow and limited exception to the general rules of forfeiture. *Herron*, 215 Ill. 2d at 177.

¶ 30        Defendant carries the burden of persuasion under both prongs of the plain error rule. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009). Defendant asserts that both prongs of the plain error rule apply in this case because the evidence was very closely balanced and the denial

of his right to present a complete defense is a serious error that challenges the integrity of the judicial process. However, "[t]he first step of plain-error review is to determine whether any error occurred." *Lewis*, 234 Ill. 2d at 43. We will review defendant's claim to determine if there was any error before considering it under plain error.

¶ 31 The admission of evidence lies within the sound discretion of the trial court, and a reviewing court will review the trial court's ruling only for an abuse of discretion. *People v. Leak*, 398 Ill. App. 3d 798, 824 (2010). An abuse of discretion occurs "only where the [trial court's] ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Leak*, 398 Ill. App. 3d at 824.

¶ 32 Defendant asserts that the evidence he sought to introduce regarding Knighton's character was admissible under our supreme court's decision in *Lynch*. In that case, the court held that when self-defense is properly raised, evidence of the victim's aggressive and violent character may be offered either to show that (1) the defendant's knowledge of the victim's violent tendencies affected his perceptions of and reactions to the victim's behavior, or (2) to support the defendant's version of the facts when there are conflicting versions of events. *Lynch*, 104 Ill. 2d at 200. "Under the first approach, evidence is relevant only if the defendant knew of the victim's violent acts. Under the second approach, the defendant's knowledge is irrelevant." *People v. Nunn*, 357 Ill. App. 3d 625, 631 (2005). Defendant specifically details several instances where his attorney asked questions concerning Knighton's reputation or history, but the State's objection to each question was sustained.

¶ 33 The State initially contends that defendant has forfeited this issue for failing to make an offer of proof for any of the evidence he sought to admit at trial. Alternatively, the State also argues, citing *People v. Figueroa*, 381 Ill. App. 3d 828, 843 (2008), that the evidence of Knighton's violent reputation was not admissible because the victim was Hamilton, not Knighton. Defendant responds that this argument is contrary to the longstanding doctrine of transferred intent. "Under the doctrine of transferred intent, defendant can be exonerated if he shoots an assailant in self-defense but injures another; defendant's intent to shoot his assailant in self-defense is transferred to the unintended victim." *People v. Blue*, 343 Ill. App. 3d 927, 936 (2003). Although we agree that a victim's reputation for violence may be admissible in a case of self-defense where an innocent bystander is injured as a result of defendant's actions, we still must determine whether the trial court's rulings in this case were error. *Contra Figueroa*, 381 Ill. App. 3d at 843.

¶ 34 When a trial court refuses to admit evidence, a formal offer of proof is needed to preserve an appealable issue. *People v. Peeples*, 155 Ill. 2d 422, 457 (1993); see also *People v. Armstrong*, 183 Ill. 2d 130, 155 (1998). "The two primary functions of an offer of proof are to disclose to the trial judge and opposing counsel the nature of the offered evidence, enabling them to take appropriate action, and to provide the reviewing court with a record to determine whether exclusion of the evidence was erroneous and harmful." *People v. Thompkins*, 181 Ill. 2d 1, 10 (1998). "Where it is not clear what a witness would say, or what his basis would be for saying it, the offer of proof must be considerably detailed and specific. A reviewing court can thereby know what was excluded and determine whether the exclusion was proper." *Peeples*, 155 Ill. 2d at 457-58. "An adequate offer of proof is the key to preserving a trial court's error in excluding evidence." *Thompkins*, 181 Ill. 2d at 10. The failure to make an adequate offer of proof forfeits the issue on appeal. *Peeples*, 155 Ill. 2d

at 458.

¶ 35    Defendant, citing *Lynch*, responds that an offer of proof was unnecessary because the trial court believed that the evidence of Knighton's reputation was inadmissible. In *Lynch*, the supreme court noted that the "requirement of an offer of proof is not a formalistic ritual, but an aid to justice." *Lynch*, 104 Ill. 2d at 202 (citing *Giddings v. Williams*, 336 Ill. 482, 489-90 (1929)). The *Lynch* court also stated that "if a question shows the purpose and materiality of the evidence, is in a proper form, and clearly admits of a favorable answer, the proponent need not make a formal offer of what the answer would be, unless the trial court asks for one." *Lynch*, 104 Ill. 2d at 202. However, in *Lynch*, the defendant sought to admit evidence of the victim's three prior battery convictions. The reviewing court pointed out that the "rap sheets" included in the State's discovery showed that all three convictions were recent and were from Illinois and that the defendant found out about these convictions from the State's discovery. *Lynch*, 104 Ill. 2d at 203.

¶ 36    Although it appears that defendant wanted to proffer reputation evidence, the evidence defendant sought to admit was not clearly laid out in the trial record as were the prior convictions in *Lynch*. Defendant asserts that a formal offer of proof would have been futile because the trial court considered the evidence inadmissible. Defendant, however, never requested a sidebar to discuss the admissibility of the evidence nor did he make an offer of proof. Further, we note that *Peeples*, *Thompkins* and *Armstrong* are more recent decisions from the supreme court concerning the requirement of a formal offer of proof, and we will adhere to the more recent holdings of the supreme court. We will consider each instance to determine if defendant's failure to make an offer of proof prohibits this court's review.

¶ 37    The first ruling discussed by defendant occurred during his testimony. Defense counsel asked what happened when defendant approached Knighton. Defendant responded, "I was pretty much–my–I should say my spirit *** arose at the time. I was a little angry about that because that's like the second incident with me and him on that–" At this point, the prosecutor objected and the trial court sustained the objection. There was no further discussion regarding this question and no request for a sidebar. However, in the next few questions, defendant specifically stated that this was Knighton's "second time giving somebody a gun of [defendant's] knowledge." When asked what he did based on this being the second time, defendant detailed how he was "disappointed" and "angry," with his voice a little loud while speaking with Knighton. In response, Knighton got "real aggressive." No objection was made to this testimony.

¶ 38    We find no error in this ruling. Without an offer of proof by defendant, the record shows that after the objection, defendant testified about the second time Knighton gave a gun to another person. There is no indication in the record that the sustained objection concerned another incident between defendant and Knighton. In any event, it appears to us that this information about Knighton giving guns to individuals came in as evidence at trial.

¶ 39    The next ruling at issue occurred after defendant testified that Knighton said he would "F" defendant up. Defense counsel asked defendant how that made him feel, defendant responded that he "felt that [Knighton] was a man of his word as far as that level because that's what he's proned [*sic*] to be doing." The prosecutor voiced an objection, which the court sustained. Defendant contends that his history with Knighton and the reason for his fear of harm was admissible as part of his self-defense claim. Again, no offer of proof was made

to explain what Knighton was "prone" to do. Following the objection, defendant was asked if he was scared or afraid at that time and he responded that he was. Since the record does not indicate what evidence would have been presented about Knighton's history, we cannot find any error.

¶ 40  As a general rule, the "[p]roper foundation for reputation testimony is established when the witness is shown to have 'adequate knowledge of the person queried about' and the evidence of reputation is 'based upon contact with the subject's neighbors and associates rather than upon the personal opinion of the witness.' " *In re Jessica M.*, 399 Ill. App. 3d 730, 738 (2010) (quoting *People v. Moretti*, 6 Ill. 2d 494, 523-24 (1955)). Here, there was no foundation concerning how defendant knew Knighton's reputation and what he was "prone" to do. Defendant had not testified about his knowledge of Knighton, such as defendant's familiarity with Knighton's neighbors and associates and Knighton's reputation. Without an adequate foundation or offer of proof, we cannot ascertain the basis of defendant's reputation knowledge. We find no error.

¶ 41  Next, defendant complains of several rulings that prevented him from presenting *Lynch* evidence of Knighton's violent character. The first of these rulings occurred after he was asked where he knew Knighton from, and he responded, "Well, he got a reputation in the hood as like when people see him they call him the stick-up man, but he got a valid reputation in the hood." The State objected to the form of the question and foundation, and the court sustained the objection and defendant's response was stricken.

¶ 42  Later, when asked to describe how Knighton looked when defendant pulled his gun, defendant responded, "Uhm, pretty much like, you hear a lot of things. He got a pretty devious reputation in the neighborhood, so you hear a lot of things and then I also seent [*sic*] him do some things and–" At this point the State objected to the improper foundation. The objection was sustained and the jury was instructed to disregard defendant's statement as to Knighton's reputation.

¶ 43  Defendant argues that both of these objections were improperly sustained because defendant had a right to testify as to Knighton's violent reputation under *Lynch*. Again, there was no testimony laying a foundation for the basis of defendant's knowledge of Knighton's reputation. Further, defendant's responses did not answer the questions posed and the statements about Knighton's reputation were not solicited from his attorney. Defense counsel had not asked any questions to explain how defendant knew Knighton's reputation. Rather, defendant's testimony was conclusory and without a sufficient foundation. Additionally, no offer of proof was requested to explain the foundation for defendant's knowledge as to Knighton's reputation or exactly what that reputation was. The trial court did not err in sustaining both of these foundation objections.

¶ 44  Next, defendant asserts that he was prevented from presenting *Lynch* evidence of Knighton's violent character to support his theory that Knighton was the aggressor after the State elicited evidence that defendant was the aggressor. During Hamilton's cross-examination, defense counsel asked Hamilton if she knew "a man named Jed," and if she knew him "from the neighborhood." Hamilton answered yes to both of these questions. Next, counsel asked, "Jed is a pretty aggressive kind of violent guy?" The State objected and the court sustained the objection. No request for an offer of proof was made, nor were any foundation questions asked of Hamilton as to how she knew Knighton's reputation from his

neighbors or associates. Hamilton was only asked if she knew Knighton from the neighborhood. This was not a sufficient foundation for Hamilton to testify about Knighton's reputation. Without more foundational testimony or an offer of proof establishing how Hamilton knew Knighton was "a pretty aggressive kind of violent guy," the record is insufficient to support any error. Additionally, it is not clear that answer would have been favorable to defendant without an offer of proof.

¶ 45　　Defendant next argues that the trial court improperly prevented Walsh from testifying about Knighton's reputation. During cross-examination, defense counsel asked Walsh if she knew Knighton, and she answered that she knew "of him." Counsel next asked if she knew "him for carrying guns in the neighborhood." The State made an objection, which the court sustained. Counsel then asked what Walsh knew about "Jed" and whether "Jed" had a "good reputation in the neighborhood." The State raised objections to both of these questions and both objections were sustained. Counsel asked Walsh where she knew Knighton from, and she responded "LeClaire Courts." Next, counsel asked how familiar she was with "this Jed." The State objected that the question had been "asked and answered." The court sustained the objection. Defense counsel indicated that he did not ask that question previously and the court responded that "the witness has already testified she knew him from LeClaire Courts. Ask another question." Counsel asked Walsh how often she saw Knighton, and Walsh responded, "Almost everyday." Defense counsel then changed his line of questioning to Walsh's statements to the assistant State's Attorney.

¶ 46　　During this discourse, defendant established some foundation for Walsh to testify about Knighton's reputation. She testified that she knew "of" Knighton from LeClaire Courts, but a question asking if Knighton had a "good reputation" was objected to and sustained. Defense counsel did not request a sidebar or ask to make an offer of proof regarding Walsh's knowledge of Knighton's reputation in LeClaire Courts. Further, defense counsel did not continue his foundation questions for Walsh to testify about Knighton's reputation, but instead changed the subject of his examination. Since the record does not disclose that Walsh's testimony about Knighton's reputation would have been favorable to the defense, we cannot find any error.

¶ 47　　Defendant next argues that the trial court precluded the defense from discussing Knighton's character in closing arguments. The State made an oral motion *in limine* to bar the defense from referring to Knighton's reputation for violence in closing, contending that the defense's attempt to elicit testimony as to Knighton's reputation for violence in the community was "not perfected" because there was "not [a] proper foundation" and there was no other evidence in the record with regard to Knighton's reputation. Following arguments by the parties, the court granted the motion. In his brief, defendant admits that "there was virtually no testimony that Knighton was ever violent, because the judge had repeatedly prevented the defense from presenting that evidence." Defendant then asks this court to "hold that the trial judge erred by preventing [defendant] from presenting Hamilton's and Walsh's testimony of Knighton's reputation for violence." This relief requested does not correspond to the motion *in limine* regarding closing arguments. Moreover, in his argument, defendant reasserts his previous arguments for admission of *Lynch* evidence during witness testimony. Since this evidence was not admitted based on prior proper evidentiary rulings by the trial court, the defense could not have raised it during closing. "It is improper to argue

assumptions or facts not based upon the evidence in the record." *People v. Johnson*, 208 Ill. 2d 53, 116 (2003). Accordingly, the trial court did not err in granting the State's motion *in limine* as the evidence of Knighton's reputation for violence was not part of the trial record.

¶ 48 Next, defendant contends that in two instances the trial court improperly excluded evidence regarding the police investigation of Knighton. During Detective Proctor's cross-examination, defense counsel asked if during the course of the investigation, the detective talked to Knighton. Detective Proctor answered yes. Defense counsel next asked, "Any reason why?" The prosecutor then objected and the objection was sustained. Defense counsel then asked, "So, you just randomly decided to talk to [Knighton]?" The prosecutor objected again and the trial court sustained the objection for relevance. Defendant did not request to make an offer of proof.

¶ 49 Later, during Officer Aguilera's cross-examination, defense counsel verified that Officer Aguilera made a reference to Knighton in his report, which Officer Aguilera confirmed. Defense counsel asked if the officer looked for Knighton, but the officer answered that he went to the hospital to see how Hamilton was doing. Defense counsel noted that a reference in the officer's report was that Knighton was not on the scene, Officer Aguilera responded affirmatively. Defense counsel then asked, "So, you looked for [Knighton]?" The prosecutor raised an objection, which the trial court sustained. Defense counsel did not make an offer of proof and stated that he had nothing further.

¶ 50 Defendant asserts that these two inquiries were proper and relevant to show the course of the officer's investigation. However, the record does not establish what evidence defendant was seeking to admit and defense counsel did not ask to make an offer of proof. Further, the officers admitted Knighton was mentioned in police reports and that Detective Proctor spoke with Knighton. " 'To establish [his] course of conduct, a police officer may testify that [he] had a conversation with an individual and that [he] subsequently acted on the information received.' " *People v. Mims*, 403 Ill. App. 3d 884, 897 (2010) (quoting *People v. Johnson*, 199 Ill. App. 3d 577, 582 (1990)). " 'However, the officer cannot testify as to the substance of [his] conversation with the individual because that would be inadmissible hearsay.' " *Mims*, 403 Ill. App. 3d at 897 (quoting *Johnson*, 199 Ill. App. 3d at 582). We question whether the evidence defendant was seeking to introduce qualified as course of investigation, but since neither officer could have testified about the substance of any conversations with Knighton and without an offer of proof to show this court what evidence as to the course of investigation would have been admissible, we are unable to review this issue because the record is insufficient. Accordingly, we find no error in these rulings.

¶ 51 Finally, defendant contends that the trial court erred by sustaining an objection during Hamilton's cross-examination that undermined the defense's ability to establish that Knighton was present at the time of the shooting. Hamilton testified that when she saw defendant with a gun, there was no one else present. During cross-examination, defense counsel asked Hamilton "if it was possible that there were other people out on the street that [she] didn't see because [she] were running and [she] were scared." The prosecutor made an objection "as to what is possible," which the court sustained. Defense counsel next asked Hamilton if there were any other people on the street and Hamilton answered that she did not see anybody else. Defense counsel continued, "It was completely empty. It's almost noon on a sunny summer day and there was just [defendant] on the street?" Hamilton answered yes.

¶ 52    Defendant argues that he was entitled to question Hamilton on her perception of the event and ask whether it was possible that she did not see other people in the area. Despite the sustained objection on this question, defense counsel did call into question Hamilton's perception of the area by highlighting the implausibility that no one else was outside at noon on a sunny summer day. Since defense counsel was able to question Hamilton on her memory of the area where the shooting occurred, there was no error.

¶ 53    After reviewing the entire record, we conclude that defendant failed to follow the guidelines under *Lynch* to admit evidence of Knighton's reputation for violence. Under *Lynch*, a formal offer of proof is not needed "if a question shows the purpose and materiality of the evidence, is in a proper form, and clearly admits of a favorable answer." *Lynch*, 104 Ill. 2d at 202. The questions posed by defense counsel did not satisfy these guidelines. These questions for the most part did not show the purpose and materiality of the evidence, were not in a proper form and did not admit of a favorable answer.

¶ 54    Based on the record on appeal and defense counsel's failure to make any offers of proof before the trial court, we cannot conclude that the trial court improperly denied defendant the right to present self-defense evidence under *Lynch*. Additionally, the trial court never indicated by any words or rulings that evidence of Knighton's reputation for violence was inadmissible. Accordingly, defendant's argument for plain error fails.

¶ 55    Next, defendant asserts that the trial court violated his right to due process by denying his request to allow Williams to change out of jail attire before testifying at trial. Defendant contends that the trial court's compulsion of a defense witness to testify in jail attire undermined Williams' credibility before the jury because the jury would not have known that Williams was in custody at the time of trial. The State maintains that no due process violation has been established when a defense witness testifies in jail attire and that the clothing worn by Williams did not affect the outcome of the case.

¶ 56    At the close of the State's case and outside the presence of the jury, defense counsel requested that Williams be permitted to change into "street clothes." The trial judge responded, "Do the order." A few minutes later, the State raised an objection that Williams not be allowed to change out of his jail attire and into civilian clothing. The State contended that Williams "has no right[ ] to try and convince the jury that he's not in custody." The State asserted that it was a security risk for Williams to change while in the custody of Cook County jail and "he doesn't have any right to that nor does the Defendant have any right to clean up his witnesses before trial." In response, defense counsel argued about the prejudicial effect of Williams testifying in "IDOC clothing" on the jury. The trial judge asked defendant if he had "case law that says the witness has a right to be in civilian garb." Defense counsel answered that he did not, but again raised the concern of the prejudicial effect and denying defendant a fair trial. The judge then noted that the case law relating to the right of a defendant to testify in civilian clothing "does not extend to a witness, so therefore your witness will not be granted the right to be in civilian dress."

¶ 57    "A defendant's right to a fair trial is violated when he is forced to appear before the jury in readily identifiable jail clothing." *People v. Steinmetz*, 287 Ill. App. 3d 1, 6 (1997) (citing *Estelle v. Williams*, 425 U.S. 501, 505-06 (1976)). Defendant cites several out-of-state cases which have extended this reasoning to witnesses testifying while wearing jail clothing. See *Hightower v. State*, 154 P.3d 639, 642 (Nev. 2007); *State v. Artwell*, 832 A.2d 295, 303 (N.J.

2003); *State v. Rodriguez*, 45 P.3d 541, 545 (Wash. 2002); *State v. Allah W.*, 543 S.E.2d 282, 288 (W. Va. 2000); *State v. Yates*, 381 A.2d 536, 537 (Conn. 1977); *Mullins v. State*, 766 So. 2d 1136, 1136-37 (Fla. Dist. Ct. App. 2000).

¶ 58   The State has referred us to one case on this issue in Illinois and there, the court declined to find prejudicial error. In *People v. Sledge*, 92 Ill. App. 3d 1051, 1058 (1981), the defendant argued on appeal that a prejudicial trial error occurred when one of the State's witnesses testified in jail garb. The reviewing court found that the defendant was not prejudiced when a witness wore jail clothing when called to testify. *Sledge*, 92 Ill. App. 3d at 1058. The trial court's decision to deny defendant's request is in line with the holding in *Sledge*. Nevertheless, defendant asks this court to find trial error when a witness is precluded from testifying in civilian clothing.

¶ 59   The Supreme Court of Nevada in *Hightower* recognized that the "overwhelming majority of jurisdictions hold that an incarcerated witness should not be compelled to testify in prison clothing." *Hightower*, 154 P.3d at 641; see also *Artwell*, 832 A.2d at 300-01; *Rodriguez*, 45 P.3d at 542-43.

> "Almost uniformly, courts have recognized that requiring an incarcerated defense witness to appear in prison clothing may prejudice the accused by undermining the witness's credibility in an impermissible manner. Moreover, the jurors may believe a defense witness associated with the accused is putatively guilty and view the defendant as 'guilt[y] by association.' And absent unusual circumstances, no state interest is furthered by requiring an incarcerated witness to testify in prison clothing." *Hightower*, 154 P.3d at 641 (citing *Yates*, 381 A.2d at 537, *Artwell*, 832 A.2d at 303, *Rodriguez*, 45 P.3d at 544, *Allah W.*, 543 S.E.2d at 286, and *State v. Russell*, 895 A.2d 1163, 1172 (N.J. Super. Ct. App. Div. 2006)).

¶ 60   As the *Hightower* court noted, the American Bar Association (ABA) also recommends that a defense witness not be compelled to testify in jail attire. *Hightower*, 154 P.3d at 641. Specifically, the ABA standards provide: "The court should not permit a defendant or witness to appear at trial in the distinctive attire of a prisoner, unless waived by the defendant." ABA Standards for Criminal Justice: Discovery and Trial by Jury § 15-3.2(b) (3d ed. 1996). The Supreme Court of New Jersey in *Artwell* found that requiring an incarcerated witness to testify in jail attire " 'furthers no vital State interest.' " *Artwell*, 832 A.2d at 303 (quoting *State v. Maisonet*, 763 A.2d 1254, 1258 (N.J. 2001)).

¶ 61   In holding that trial courts should not compel an incarcerated witness to testify in jail attire, the *Hightower* court held that the burden was on the defendant to make a timely request for the incarcerated witness not to testify in jail attire and a failure to do so is deemed a forfeiture of the right. *Hightower*, 154 P.3d at 642. Further, if the trial court denies the defendant's request, it must set forth its findings on the record, and the decision will be reviewed for an abuse of discretion. *Hightower*, 154 P.3d at 642; see also *Allah W.*, 543 S.E.2d at 287.

¶ 62   We agree with the reasoning in these cases. If a defendant makes a timely request that an incarcerated witness not testify in jail attire, the trial court should weigh the prejudicial effect against any security or other State interests, if any. Here, the trial court's denial of defendant's request did not include a consideration of the potential prejudicial effect in its

findings. While we agree that trial courts should exercise discretion in considering a defendant's request for witnesses to testify in civilian clothing to prevent any unnecessary prejudice, we also note that "the right not to be tried in jail clothing is, like many other rights of criminal defendants, subject to harmless-error analysis." *Steinmetz*, 287 Ill. App. 3d at 6-7 (citing *Estelle*, 425 U.S. at 506); see also *People v. Medley*, 111 Ill. App. 3d 444, 448 (1983). Since the right of a criminal defendant not to be tried in jail attire is subject to harmless error and several cases from other jurisdictions also recognize that any error when a witness is compelled to testify in jail attire may be harmless beyond a reasonable doubt (*Hightower*, 154 P.3d at 642; *Yates*, 381 A.2d at 537; *Mullins*, 766 So. 2d at 1137), we would similarly find that harmless error analysis is applicable. When considering harmless error, the defendant would have made a timely objection and preserved the error and, thus, it is the State that carries the burden of proving beyond a reasonable doubt that the jury verdict would have been the same absent the error. *People v. Thurow*, 203 Ill. 2d 352, 363 (2003).

¶ 63    In this case, we conclude that even if the trial court erred in denying defendant's request for Williams to change into civilian clothing before testifying at trial, any error was harmless because the evidence of defendant's guilt was overwhelming. Defendant did not contest the fact that he shot Hamilton, who was 10 years old at the time of the shooting, but argued that he acted in self-defense. Hamilton was walking home from day camp with her sister to pick up her other siblings for lunch. Hamilton was struck in her leg by a bullet that traveled through her right leg and grazed the back of her left calf. Hamilton named defendant as the individual who shot her and identified him in a photo array. Defendant visited Hamilton in the hospital and admitted to her mother that he did not mean to shoot Hamilton. Defendant contended at trial that he was acting in self-defense because he meant to shoot another individual, Knighton.

¶ 64    Defendant testified that he approached Knighton to discuss his displeasure with Knighton giving guns to young men in the neighborhood. Defendant had possession of a gun given to Kevin Whitaker by Knighton. Whitaker was not related to defendant nor was he a friend of defendant. Defendant said he knew Whitaker from playing basketball. Defendant admitted that he did not go to the police station to give them the gun he received from Whitaker. Rather, defendant stated that he intended to return the gun to Knighton and sought out Knighton.

¶ 65    When defendant saw Knighton, defendant said he walked up to Knighton. At this time, the gun was in his jacket pocket. Defendant stated that he was wearing a "summer peacoat" in July 2005. He spoke with Knighton and admitted to being "pissed off." Defendant testified that Knighton told defendant "to stay the 'F' up out of his business and that he was going to 'F' [him] up." Defendant said that he believed Knighton would act on this statement. Defendant stated that when he thought Knighton began to reach for a gun in his waistband, defendant pulled out his gun and fired toward the ground. He also fired at least three other shots. Defendant said that Knighton did not know defendant had a gun in his possession.

¶ 66    Defendant further testified that even though he believed this occurred between 10 a.m. and noon, he did not think it was lunch time at the food site. After the shooting, defendant said he fled the scene and went to his mother's house. He admitted that he did not call the police and report that he had fired a gun in self-defense.

¶ 67    Williams testified that defendant approached Knighton to confront Knighton about giving

-14-

guns to young people in the neighborhood. Williams stated that when Knighton started to reach for a gun, defendant fired a shot. This testimony was substantially similar to defendant's testimony.

¶ 68    However, Williams' testimony also contradicted defendant's testimony. Williams testified that defendant did not appear angry, though defendant admitted to being "pissed off." Defendant stated that he had the gun in a jacket pocket and Knighton did not know defendant had a gun in his possession. Williams testified that defendant approached Knighton with a gun in the palm of his hands, which were extended in front of him. Williams said that defendant was trying to hand the gun to Knighton when Knighton started to reach for his own gun. Williams also described Knighton's gun as black, while defendant stated that it was a chrome revolver. Williams admitted that he did not speak with police and did not tell anyone that he was present until his trial testimony.

¶ 69    Additionally, defense counsel argued that defendant acted in self-defense and the jury received instructions on self-defense. In its verdicts, the jury rejected defendant's claim of self-defense. Though the jury found defendant not guilty of attempted first degree murder, defendant was found guilty of aggravated battery of a child and aggravated battery with a firearm. Defendant presented a defense of self-defense, which the jury rejected. Defendant's testimony was that he took possession of a gun from a man that was neither a friend nor a relation and rather than take it to the police, he sought out the man that gave out the gun. Defendant approached Knighton to confront him about giving guns to young men and defendant admitted that he was "pissed off." He denied that Knighton knew he had a gun in his possession, specifically in his jacket pocket on a July afternoon, although defendant's only witness stated that defendant approached Knighton with the gun in his extended hands. As Knighton got angry and began to reach for his own gun, defendant fired once in the ground, another shot that was not aimed at Knighton and at least two more shots in the air. Defendant did not know if Knighton ever fired his gun. Both defendant and Williams testified that Knighton started to flee in the opposite direction from defendant when the shooting began. Even though he claimed he acted in self-defense, defendant did not remain at the scene, but fled and did not report the shooting to the police.

¶ 70    Given the overwhelming evidence of defendant's guilt, we find that Williams' appearance at trial in jail attire did not affect the outcome of the trial and was harmless beyond a reasonable doubt.

¶ 71    Finally, defendant contends that the trial court misapprehended the sentencing range and improperly considered an aggravating factor inherent in the offense, Hamilton's age, when imposing defendant's sentence. Specifically, defendant argues that the trial court improperly imposed an enhancement of 25 years based on Hamilton's age because the aggravating factor, a victim under the age of 12, is not a separate term of enhancement, but a change in the sentencing range, and Hamilton's age is inherent in the offense of aggravated battery of a child. Defendant asks this court to vacate his sentence and remand for a new sentencing hearing. The State responds that the trial court properly sentenced defendant to the additional term of 25 years based on the mandatory firearm enhancement.

¶ 72    "It is well established that a trial court has broad discretionary authority in sentencing a criminal defendant." *People v. Evans*, 373 Ill. App. 3d 948, 967 (2007). "An appellate court typically shows great deference to a trial court's sentencing decision since the trial court is

in a better position to decide the appropriate sentence." *Evans*, 373 Ill. App. 3d at 967. "Accordingly, a trial court's sentencing decision is not overturned absent an abuse of discretion." *Evans*, 373 Ill. App. 3d at 967. "In determining an appropriate sentence, the trial judge is further required to consider all factors in aggravation and mitigation which includes defendant's credibility, demeanor, general moral character, mentality, social environments, habits, and age, as well as the nature and circumstances of the crime." *Evans*, 373 Ill. App. 3d at 967. "If the sentence imposed is within the statutory range, it will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense." *People v. Starnes*, 374 Ill. App. 3d 132, 143 (2007) (citing *People v. Fern*, 189 Ill. 2d 48, 54 (1999)).

¶ 73    Here, defendant was found guilty of aggravated battery of a child. At the time of the offense, aggravated battery of a child was codified under section 12-4.3 of the Criminal Code of 1961.[1] 720 ILCS 5/12-4.3 (West 2004). Under section 12-4.3(b)(3), aggravated battery of a child was a Class X felony, except that "if, during the commission of the offense, the person personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person, 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court." 720 ILCS 5/12-4.3(b)(3) (West 2004). The sentencing range for a Class X offense is 6 to 30 years in prison. 730 ILCS 5/5-8-1(a)(3) (West 2004)[2]. The supreme court observed that the firearm enhancements "add a mandatory additional term of years to whatever sentence would otherwise be imposed." *People v. Sharpe*, 216 Ill. 2d 481, 484-85 (2005). Accordingly, the minimum sentencing range applicable in defendant's case under section 12-4.3(b)(3) was 31 to 55 years in prison. Defendant received a sentence of 25 years for the offense and an additional 25 years' enhancement. Defendant's aggregate 50-year sentence is within the statutory range.

¶ 74    Defendant's argument, however, is that the trial judge imposed the enhancement based on a finding that the victim was under the age of 12. Defendant contends that the judge, rather than impose the mandatory firearm enhancement, improperly sentenced defendant to an extended term based on the age of the victim. Section 5-5-3.2(b)(3)(i) of the Unified Code of Corrections allows for the imposition of an extended-term sentence when a defendant commits any felony against a person under 12 years of age at the time of the offense. 730 ILCS 5/5-5-3.2(b)(3)(i) (West 2008). Under section 5-8-2(a)(2), the extended-term sentence for a Class X felony was 30 to 60 years. 730 ILCS 5/5-8-2(a)(2) (West 2008).[3] Defendant asserts that an extended-term sentence based on the aggravating factor of the victim's age was an improper double enhancement because Hamilton's age was inherent in the conviction for aggravated battery of a child. Further, defendant points out that an extended-term sentence does not include a separate enhanced term, but instead provides a different sentencing range for a single sentence.

---

[1]Aggravated battery based on the injury to a child is now codified at 720 ILCS 5/12-3.05(b).

[2]Now codified at 730 ILCS 5/5-4.5-25(a).

[3]Now codified at 730 ILCS 5/5-4.5-25(a).

¶ 75 At sentencing, the trial judge stated that she was imposing an "enhancer" because "it is a child." The judge reasoned that a child

> "should not be shot when a child is in her community and she should not have to know about guns and bullets and people running through her community shooting and you should have taken into consideration that there was not only citizens, but that these were children and you choose to approach this individual with your gun outside of a food court where children from the projects go to get free meals ***. You shot in the area of the daycare facility and you have a reckless disregard for anybody who was in the area and all you saw was the individual that you were pursuing and immediately upon seeing him, you started shooting. He didn't pull his gun first. *** That's how this child got shot."

The judge later said the enhancement was based "solely on the fact that she is a child under the age of 12."

¶ 76 At the hearing on defendant's motion to reconsider his sentence, defense counsel specifically asked the judge to reconsider the enhancement based on the age of the victim. The prosecutor added "rather than the firearm being personally discharged by the defendant." The judge then held that the enhancement was based on "[b]oth of them" because "the enhancer allows it because of her age and because a firearm is used." The judge noted that a firearm was used and that defendant did not dispute the fact that he shot a child. Defense counsel agreed with that statement. The trial judge never referred to the sentence as an extended term. The amended mittimus states, "It is further ordered that deft. has rcvd. 25 years with an additional 25 years enhancement." The mittimus does not state that an extended-term sentence was imposed.

¶ 77 In this case, the trial judge repeatedly stated that she based the enhancement on Hamilton's age, which is not a valid basis for a sentence enhancement. As noted above, the victim's age is an aggravating factor when imposing an extended-term sentence. However, the record does not refer to defendant receiving an extended-term sentence. At the hearing on defendant's motion to reconsider his sentence, defendant specifically asked the judge to reconsider her finding based on the age of the victim. The State then added a reference to the mandatory enhancement for personally discharging a firearm. The judge held that the enhancement was based on "[b]oth of them." This finding is an inaccurate statement of law because the enhancement could only be based on the discharge of a firearm.

¶ 78 Since the record indicates that the trial judge misstated the basis for defendant's sentence enhancement, we vacate defendant's sentence and remand for a new sentencing hearing to allow the trial judge to clearly state the basis for defendant's enhanced sentence.

¶ 79 Based on the foregoing reasons, we affirm defendant's convictions, vacate his sentence and remand for a new sentencing hearing.

¶ 80 Affirmed in part and vacated in part; cause remanded.