2021 IL App (1st) 201059-U

FIFTH DIVISION
AUGUST 13, 2021

Nos. 1-20-1059 & 1-21-0271

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| *In re* A.D., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 17 JD 01095 |
| v. | ) | |
| | ) | Honorable |
| A.D., a Minor, | ) | Marianne Jackson and |
| | ) | Darron Edward Bowden, |
| Respondent-Appellant). | ) | Judges Presiding. |

_____

JUSTICE CUNNINGHAM delivered the judgment of the court.
Justices Hoffman and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:   There was sufficient evidence to find the juvenile respondent guilty of attempted murder of a peace officer; the trial court did not allow inadmissible evidence; and the trial court did not impose an excessive sentence.

¶ 2    The respondent-appellant, A.D., a minor at the time of the offense, appeals from the

judgment of the circuit court of Cook County finding him guilty of attempted murder of a peace

officer and sentencing him to 20 years' imprisonment. For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 3                                            BACKGROUND

¶ 4      On June 7, 2017, the State filed a petition for adjudication of wardship, alleging that A.D. committed eight counts of attempted murder, including attempted murder of a peace officer, (counts 1-8), four counts of aggravated discharge of a firearm (counts 9, 10, 12, and 13), one count of armed violence (count 11), one count of aggravated possession of a stolen vehicle (count 14), one count of possession with intent to deliver a controlled substance (count 15), one count of aggravated fleeing or attempt to elude a police officer (count 16), two counts of aggravated unlawful use of a weapon (counts 17 and 18), and one count of unlawful possession of firearms (count 19). The charges arose out of a shooting that occurred on June 5, 2017, when A.D. was 17 years old. The State subsequently *nolle prossed* counts 3, 4, 7, 8, 11, 15, and 19. Prior to trial, the proceedings were designated as an extended juvenile jurisdiction prosecution (EJJP).[1]

¶ 5      A bench trial commenced, and the following evidence was presented. Chicago Police Officer Andrew David testified that, on June 5, 2017, he was on routine patrol with his partner, Officer Hernandez. Officer Hernandez was driving an unmarked police vehicle, a tan four-door sedan, while Officer David rode in the passenger seat. Both officers were wearing "civilian dress," which he described as "normal clothing." However, Officer David was wearing his bulletproof police vest. The vest displayed his badge number on the front and the word "Police" on the back.

---

[1]When a minor is subject to an extended jurisdiction juvenile prosecution and the trial results in a guilty verdict, the trial court must impose both a juvenile sentence and an adult sentence, staying the adult sentence on the condition that the minor not violate the provisions of the juvenile sentence. 705 ILCS 405/5–810(4) (West 2016).

¶ 6    At approximately 8 p.m. on June 5, 2017, Officers David and Hernandez were driving to 13th and Troy Streets in Chicago. Officer David described the conditions as a "sunny day." As they approached the location in their unmarked vehicle, they saw a group of individuals drinking and smoking on the corner. Officer Hernandez drove up to the individuals and stopped the unmarked police vehicle in the center of the street. Officer David exited the vehicle while Officer Hernandez remained sitting inside it. Officer David talked to the group of individuals for about "15 or 20 seconds" and told them that "if they were drinking or smoking to take it inside for the night." He then began walking back to the unmarked police vehicle.

¶ 7    As Officer David walked back to the vehicle, he saw "two [male] individuals emerge from the alley running." They were about 100 feet away from where Officer David was standing and he was able to describe their clothing and demeanor. The two individuals each extended an arm and pointed a gun in the direction of Officer David. They began shooting. Officer David heard approximately eight gun shots which were very loud. Officer David briefly "hit the ground" while Officer Hernandez remained sitting inside the unmarked police vehicle, which was directly behind Officer David.

¶ 8    Officer David then stood up, drew his gun, and began running toward the two shooters. As he ran toward the shooters, he saw them run into the alley. Officer David pursued them on foot, and Officer Hernandez caught up with him in the unmarked police vehicle. At that point, Officer David saw the shooters running toward a vehicle in the alley. Officer David described the vehicle as a "red Nissan SUV." The two shooters approached the red Nissan SUV and entered it. Once they closed the doors, the red Nissan SUV drove off.

¶ 9      Officer David testified that he anticipated that the red Nissan SUV would exit the alley from the west, so he ran in that direction. Meanwhile, Officer Hernandez pursued the red Nissan SUV through the alley. As he ran, Officer David briefly lost sight of the red Nissan SUV but then saw it exit the alley, followed by Officer Hernandez in the unmarked police vehicle. Officer David radioed a description of the red Nissan SUV to other officers.

¶ 10      The State then published surveillance video clips from a King Fine Foods at 1303 South Kedzie Avenue, a location near the shooting. The timing of the video clips showed that they were captured a few minutes before the shooting occurred.[2] As the video clips played, the State asked Officer David to describe what was depicted in them. When a vehicle appeared in the video clips, circling the area several times, the following exchange ensued:

> "[OFFICER DAVID:] That was the vehicle that just passed.
>
> ***
>
> [DEFENSE COUNSEL:] I'd object to Officer David testifying to anything about this video at this time. This is not an -- an area that this officer was at[,] at the time.
>
> THE COURT: Well, the officer's testified that he's familiar with this location. He's been there a lot, so I -- this Court doesn't have any problem with it.
>
> [DEFENSE COUNSEL:] Judge, I didn't object when he was describing what the -- what the video was showing, but he was trying to interject just now about something on the video itself. In the video, this is not something that he has direct knowledge of. He's telling you what he sees in that video. I think that's

---

[2]The record shows that the time stamp on the surveillance video footage was on a 17-minute delay.

something for the Court to determine for yourself what is being shown on that video.

THE COURT: [Defense counsel], the objection is overruled. Although, it would be -- was a good point that the officer ought to wait until there are questions being asked of him before he starts to volunteer information.

[THE STATE:] Now, Officer David, you just observed the clip from camera two playing again from 19:34 and 30 seconds. Pausing the video -- just one moment -- at 19:34 and 43 seconds. Officer David, what do you see depicted on this screen at camera two, 19:34 and 43 seconds?

[DEFENSE COUNSEL:] Objection, Judge.

THE COURT: Overruled. You can answer.

[OFFICER DAVID:] I see a red Nissan, same vehicle that was in the alley.

[THE STATE]: When you say it was the same vehicle that was in the alley, what specifically about the vehicle are you able to identify?

[OFFICER DAVID:] I knew -- I know vehicles pretty well. I knew that that was a red Nissan Murano when I saw it in the alley.

[THE STATE:] And is the vehicle depicted --

THE COURT: Excuse me, [State].

[THE STATE:] Yes.

THE COURT: I will let this officer testify that it is a red Nissan Murano. Obviously, it will be up to the Court to decide whether or not it was the same one that was in the alley. Proceed.

[THE STATE:] And, Officer, is the vehicle that's depicted at 19:34 and 43 seconds the same size, shape, and color as the vehicle you observed in the alley?

[OFFICER DAVID:] Yes, it is.

\*\*\*

[THE STATE:] Officer David, what do you see depicted in camera two at the time 19:35 and 2 seconds?

[DEFENSE COUNSEL:] Judge, I renew my objection.

[OFFICER DAVID:] It's a red Nissan Murano, similar to the vehicle that I saw in the alley.

THE COURT: And the Court's ruling is the same.

[THE STATE:] What about the still shot at 19:34 and 2 seconds leads you to believe it's the same car that you observed in the alley?

[OFFICER DAVID:] It's the same color, size --

[DEFENSE COUNSEL:] Objection, Judge, again to the car.

THE COURT: Sustained as to whether it's the same car. The Court will allow him to testify that it is just like the car that was in the alley.

\*\*\*

[THE STATE:] Officer David, is this car the same size, shape, and color as the car you observed in the west alley of Troy?

[OFFICER DAVID:] Yes, it is.

\*\*\*

[THE STATE:] Officer David, what do you see depicted on camera three at

19:35 and 7 seconds?

[OFFICER DAVID:] It's a red Nissan Murano.

[THE STATE:] And is that the same size, shape, and color as the vehicle you saw in the west alley of Troy shortly after shots were fired?

[OFFICER DAVID:] Yes, it is.

***

[THE STATE:] Now, Officer David, pausing the video at 19:35 and 14 seconds, do you see a vehicle stopped at the top left corner of the screen?

[OFFICER DAVID:] Yes, I do.

[THE STATE:] At what location is that vehicle stopped?

[OFFICER DAVID:] It's stopped at the intersection of 13th and Troy.

[THE STATE:] And is that vehicle the same size, shape, and color as the vehicle you observed in the alley on June 5th of 2017?

[OFFICER DAVID:] Yes, it is.

***

[THE STATE:] Officer David, pausing the video at 19:41 and 48 seconds, do you see the vehicle that you identified as the same size, shape, and color as the SUV in the alley?

[OFFICER DAVID:] Yes.

[THE STATE:] And does it appear to have its brake lights activated?

[OFFICER DAVID:] Yes, it does.

[THE STATE:] How --

- 7 -

[DEFENSE COUNSEL:] Judge, again, I'm going to object. This is a video that your Honor can see for yourself. We don't need the officer who was not present at this time and did not see this himself testifying to what is on that video.

THE COURT: Well, *** it is beginning to become a little bit cumulative. I'm not necessarily sustaining it for the reasons you're making, but I see it."

¶ 11 Officer Hernandez testified next. He testified consistently with Officer David about the shooting. Once the red Nissan SUV drove away with the shooters inside, Officer Hernandez began to pursue it in the unmarked police vehicle. He followed the red Nissan SUV as it sped down several different streets at speeds between 70 and 120 miles per hour. He radioed to other officers that there had been shots fired at police. As the red Nissan SUV approached the expressway, about 15 to 20 more police vehicles joined Officer Hernandez in pursuing it. Officer Hernandez continued to follow the red Nissan SUV on the expressway "for quite some time."

¶ 12 Eventually, the red Nissan SUV had some kind of "mechanical failure" causing it to come to a "stalling halt." "Lots of white smoke" billowed out from the red Nissan SUV and it came to a complete stop. Officer Hernandez and the other police officers stopped their vehicles behind it. Officer Hernandez then saw three individuals removed from the red Nissan SUV by other police officers and put into custody. He identified the individual who was removed from the driver's seat as A.D.

¶ 13 The other two individuals removed from the red Nissan SUV were identified as A.D.'s codefendants, N.D. and D.J., who were both 15 years old at the time of the shooting and were tried separately from A.D.

¶ 14    Brian Smith, a police forensic investigator, testified that he recovered two guns from the red Nissan SUV. He tested A.D., as well as his codefendants, N.D. and D.J., for gun residue. The test results showed that N.D. and D.J. had gun residue on their hands and had fired guns the day of the shooting. A.D. did not have gun residue on his hands.

¶ 15    The parties stipulated that Natafa Kovacevic would testify that she was the owner of the red Nissan SUV, which she identified as a 2007 maroon Nissan Murano. On June 4, 2017, she was outside of a laundromat sitting in her SUV, with the door ajar, when she was suddenly and forcibly removed from the SUV by an unknown armed offender. The armed offender drove away in her SUV. Ms. Kovacevic was unable to identify anyone involved in the incident, but she did not know A.D. nor give him permission to drive her SUV.

¶ 16    After the State rested, A.D. moved for a directed verdict. The trial court granted the motion as to the two counts of aggravated unlawful use of a weapon (counts 17 and 18). In denying the motion for the remaining counts, the trial court stated:

"There is testimony that a car that looked exactly like the one that [A.D.] and the two other young people were arrested in within minutes of that car fleeing the scene. There's testimony that there is an automobile just like that automobile in all respects that went around and around the scene there at 13th and Troy. There is certainly an argument to be made that the purpose of that car going around and around and around that particular location was to surveil that location, to check it out, as it were, before they came back and fired at the people on that corner.

Certainly, should the Court find that the State has proven that that car which [A.D.] and the two others were arrested in shortly after the shooting is, in fact, the

- 9 -

same car that circled that location three times before the shooting took place, that would suggest that the individual driving the car was participating and had knowledge of what it is that was about to take place.

So when the evidence is viewed in the light most favorable to the prosecution, there is evidence in the record upon which the fact-finder could find beyond a reasonable doubt that [A.D.] was guilty of the matters that he has been accused of."

¶ 17   During closing arguments, the State argued that the evidence, including the surveillance video clips, showed that A.D. drove the red Nissan SUV and circled the area near 13th and Troy streets in preparation for the shooting. According to the State, A.D. drove his codefendants, N.D. and D.J., to shoot at the group of individuals sitting at the corner of 13th and Troy Streets and that he waited in the red Nissan SUV as the getaway car. The State claimed that N.D. and D.J. could easily see police officers also standing in the area, because they could see Officer David's police vest and Officer Hernandez's unmarked police vehicle, and they intentionally shot at them. The State averred that A.D. was accountable for the shots N.D. and D.J. fired at Officers David and Hernandez.

¶ 18   In his closing argument, A.D. claimed that he was not associated with N.D. and D.J. A.D. argued that he was just sitting in the red Nissan SUV in the alley and "minding his own business" when N.D. and D.J. ran to his car, "guns in hand," and "jumped in." He claimed he was "startled," and feared for his safety. A.D. saw the police chasing and decided to "hit the gas." He argued he was not "a partner but a means of escape" and so he should not be held accountable for the shooting

committed by N.D. and D.J. A.D. also averred that the State failed to prove that he was the one seen driving the red Nissan SUV in the surveillance video footage prior to the shooting.

¶ 19    A.D. further argued that, because Officers David and Hernandez did not see the direction from which N.D. and D.J. had come, and that none of the surveillance cameras revealed it, they could have come out of one of the houses on the street. A.D. asserted that more evidence was needed in order to prove that N.D. and D.J. had been brought to the scene by A.D. in the red Nissan SUV. In support of his argument that he should not be held accountable for N.D. and D.J.'s actions, A.D. argued: "The fact that [N.D.] and [D.J.] enter the car [A.D.] was driving as they fled the scene does not amount to involvement or partnership on all that happened moments earlier."

¶ 20    Additionally, A.D. argued that the State failed to prove that N.D. and D.J. knew there were police officers in the vicinity of 13th and Troy Streets, noting that the police officers were in an unmarked police vehicle. A.D. claimed that it was "unclear" exactly who N.D. and D.J. were shooting at, especially since Officer David was standing approximately 100 feet away.

¶ 21    Following closing arguments, the trial court issued its ruling. The trial court first addressed the red Nissan SUV, noting that it was not in dispute that A.D., N.D., and D.J., were all removed from the red Nissan SUV after the shooting and high-speed chase and that two guns were recovered from the vehicle. The trial court addressed A.D.'s argument that there was "no proof" that the red Nissan SUV seen circling the area prior to the shooting in the surveillance footage was the same red Nissan SUV from which he was removed. In dismissing that argument, the trial court said:

> "In other words, this Court is being asked to accept that there exists a
> reasonable possibility that there are three other red Nissan Murano SUVs that
> looked just like the one that [A.D.] was driving and all having been seen in the

vicinity of 13th and Troy on the west side of Chicago around 8:00 [p.m.] on June 5, 2017. *** To accept these scenarios as a reasonable possibility would be engaging in -- not my words, but appropriate words -- the willing suspension of disbelief. This did not happen."

¶ 22    The trial court rejected A.D.'s argument that N.D. and D.J. could have emerged from a nearby house rather than the red Nissan SUV which A.D. was driving. The court noted that after N.D. and D.J. fired their guns, they "make no attempt to run back into any house, rather they run northbound back into the alley and run straight to the Nissan Murano that they all were arrested in and get in and the car takes off."

¶ 23    The trial court also rejected A.D.'s assertion that he was simply sitting in the alley "minding his business" when "the two shooters jumped into the car" and that A.D. "took off" because he was "scared." The trial court found that the evidence showed that A.D. knew N.D. and D.J., and that he drove them to shoot at people at 13th and Troy Streets.

¶ 24    Turning to A.D.'s assertion that N.D. and D.J. were not aware there were police officers in the area where they were shooting, the trial court stated:

"Now, quite frankly, I don't know if the police were the original targets. The truth of the matter is that the Court suspects that the original targets were those individuals standing out there on the street smoking and drinking, the same people that the police came to shoo away and ordered them to take it inside. However, the shooters, once they got to the mouth of the alley could not see those people. The only person that they could see on that corner at the time was Officer David. And there was no mistaking that he was a police officer. He had on the black bulletproof

vest. His star was on the front left of the vest. There were big letters on the back saying 'police.' And he was wearing a gun which was clearly visible.

\*\*\*

Not surprisingly, this was the most difficult decision the Court had to make. Were they shooting at the police knowing they were shooting at the police? And I could come to no other conclusion other than that, yes, they were. The shooter knew Officer David was a police [officer] because everything he had on showed it was all over him he was the police.

Well, it might be argued that [A.D.] didn't know that they were going to go shoot at the police, but that's the situation that one finds themselves in with the intent to promote or facilitate the commission of an offense and you aid and abet or attempt to aid and abet that other person in the commission of the offense you become responsible for what they do. So even if their original plan was to shoot someone else, once the shooters see the police and then shoot at the police, you are now [responsible] for the fact that they shot at the police. There is no other conclusion to be reached when six shots are fired at an individual other than you were intending to kill them."

However, the trial court found that N.D. and J.D. could not have known that Officer Hernandez was sitting inside the unmarked police vehicle, which was parked nearby. So the trial court held that the State had not met its burden as to the offenses against Officer Hernandez.

¶ 25    The trial court ultimately found A.D. guilty of attempted murder of Officer David (counts 1 and 5), aggravated discharge of a firearm with regards to Officer David (counts 9 and 12),

- 13 -

aggravated possession of a stolen vehicle (count 14), and aggravated fleeing or attempt to elude a police officer (count 16).

¶ 26    The case proceeded to sentencing on July 26, 2018. Since it was designated as an EJJP, the trial court sentenced A.D. to both a juvenile sentence and an adult sentence, with the adult sentence being stayed; in order for the stay of the adult sentence to remain in place, A.D. could not violate the provisions of the juvenile sentence. The trial court imposed a juvenile sentence of commitment to the Department of Juvenile Justice for an indeterminate period not to exceed A.D.'s 21st birthday. The adult sentence of 45 years' imprisonment was then also imposed but stayed.

¶ 27    On July 3, 2019, the State filed a petition to lift the stay on A.D.'s 45-year adult sentence. The basis of the petition to lift the stay was that, on January 17, 2019, while A.D. was on parole from his juvenile sentence, he committed the offense of aggravated fleeing and eluding the police. A hearing commenced on the State's petition.

¶ 28    At the hearing, Officer Von Kondrat testified that on the morning of January 17, 2019, he was on patrol and received a report that individuals in a tan car were using weapons to rob people in a downtown Chicago alley. Officer Von Kondrat testified that he drove around the area looking down alleys for the tan car. He finally saw a tan Buick in an alley and pursued it through downtown Chicago with his police vehicle's lights and siren activated. He observed the tan Buick speed away and run through several stop signs and red lights. After the tan Buick sped onto the highway, the pursuit continued for some time. The tan Buick finally "spun out" and came to a stop in an embankment. Officer Von Kondrat saw A.D. exit from the driver's seat of the car and begin running away. Other police officers pursued A.D. on foot and arrested him.

¶ 29    Following the hearing, the trial court held that the State had met its burden and proved that A.D. committed the offense of aggravated fleeing and eluding the police. The court then lifted the stay on A.D.'s adult sentence of 45 years.

¶ 30    A.D. moved to reconsider his original 45-year sentence in light of the Illinois Supreme Court's ruling in *People v. Buffer*, 2019 IL 122327, which held that a sentence over 40 years is an unconstitutional *de facto* life sentence for a minor. The trial court granted A.D.'s motion and scheduled a new sentencing hearing.

¶ 31    On September 10, 2020, a new sentencing hearing was held before a new trial court judge. The State argued that the proper sentencing range for attempted murder of a peace officer is 20 to 80 years. Noting the factors which the trial court should consider in sentencing a juvenile as laid out in *Miller v. Alabama*, 567 U.S. 460 (2012), the State claimed that A.D. was the "organizer" and "ringleader" of the shooting and that there was no evidence that he was acting under the influence of peer pressure, especially since his codefendants, N.D. and D.J., were younger than him. The State also argued that A.D. had grown up with a "stable" mother in a household without any abuse or neglect. The State further averred that A.D. did not show any potential for rehabilitation because, among other things, he was released from the Department of Juvenile Justice on January 10, 2019, and he committed the aggravated fleeing and eluding just one week later, on January 17, 2019. The State asked the trial court to sentence A.D. to a "reasonable sentence" that was consistent with *Buffer* and *Miller*.

¶ 32    In mitigation, A.D. published the following statement:

> "I have made some mistake[s] when I was younger, but now I realize that life is serious and not a game. Being in Cook County jail taught me to value life

and have patience. When I was younger, I didn't care about anything, and I thought I was invincible. Now I know there is more to life than what's on the streets. Being locked up. Especially during this pandemic, has also helped me recognize how valuable life is. You can be here one day and gone the next. Until COVID closed programs in the jail, I was going to school here every day. I was working on my high school diploma, and I still want to accomplish that. I want to make my family proud of me. I've made some bad mistakes in the past, and I'm working on doing better for my future."

A.D. argued that at the time of the offense in 2017, a psychological evaluation suggested that, even though he was 17 years old, he was functioning with the mind of a 13- or 14-year-old. He claimed that he had struggled with mental health issues since he was 5 years old, including "a lengthy history of psychiatric hospitalizations." Opposing the State's argument, A.D. claimed that his childhood was "infused with trauma." He asserted that his childhood was "filled with abandonment" as he "bounced from one caregiver to another." A.D. claimed that he "affiliated with gang life at a young age, emulating his father, seeking attachment and a sense of belonging." When A.D. was 16 years old, he suffered a self-inflicted gunshot to the head that led to "a long, arduous recovery" and still caused ongoing effects.

¶ 33    A.D. further stressed that he did not shoot anyone during the offense or even have possession of a gun. A.D. urged the trial court to use its discretion, pursuant to section 5-4.5-105 of the Unified Code of Corrections (Code) (730 ILCS 5/5-4.5-105 (West 2016)), to sentence him in accordance with a lower Class X offense and to decline to impose any firearm enhancement. A.D. asked for a sentencing range of 6 to 30 years for the lower offense of attempted murder.

¶ 34    Following arguments, the trial court acknowledged that A.D. was 17 years old at the time of the offense and that it was going to consider the factors associated with his youth. The trial court rejected the State's argument that A.D. was the "ringleader" of the shooting but found that there was no outside pressure or influence on A.D. in committing the offense. The court noted that A.D. "struggled in the educational system" but that his mother "did the best she could." The trial court additionally stated:

> "The Court is supposed to look at childhood trauma. In the Austin neighborhood of Cook County, Chicago, there is trauma, unfortunately, witnessed by not only [A.D.], but I would say it's safe to say the majority, if not all, of the kids in that very difficult neighborhood. There are daily shootings, injuries, murders ***. So the Court is well aware that there is trauma. But the Court is also well aware that just because you have been exposed to trauma, you would then become an active participant in extending this trauma.
>
> ***
>
> [A.D.] suffered trauma at his own hands. When I was reading the reports, I had to say it's amazing that [A.D.] is even here, reportedly shot himself up under his chin, the bullet goes through the bottom of his mouth, through his tongue, through the roof of his mouth, out of his head. That's amazing. And as [the other trial judge] said, that should have been a serious wake-up call that guns are not the way to go, but unfortunately, soon thereafter, you have pictures of [A.D.] still waving a gun."

The trial court found little potential for rehabilitation, emphasizing that A.D. committed another offense only a week after his release from the Department of Juvenile Justice

¶ 35    The trial court stated that the sentencing statute for attempted murder of a peace officer required it to sentence A.D. to a range of 20 to 80 years' imprisonment and rejected A.D.'s argument that it could sentence him for a lower offense. However, the trial court did use its discretion to decline to impose the firearm sentencing enhancement. Ultimately, the trial court sentenced A.D. to the minimum term of 20 years' imprisonment, noting that A.D. was not the shooter and that no one was injured in the shooting. A.D. moved to reconsider sentence, which was denied. This appeal followed.

¶ 36                                    ANALYSIS

¶ 37    We note that we have jurisdiction to review this matter. A.D. filed a timely notice of appeal following the denial of his motion to reconsider sentence. A.D. subsequently filed a motion for a supervisory order with the Illinois Supreme Court seeking leave to file a late notice of appeal from the July 26, 2018, judgment in which he was originally found guilty and sentenced. Our supreme court granted A.D.'s motion on February 3, 2021. This court then allowed A.D. to file a late notice of appeal from that judgment and consolidated both appeals. Ill. S. Ct. R. 603 (eff. Feb. 6, 2013); R. 606 (eff. July 1, 2017).

¶ 38    A.D. presents the following issues: (1) whether the State proved him guilty of attempted murder of a peace officer beyond a reasonable doubt; (2) whether the trial court erred in allowing Officer David's testimony because it violated the personal knowledge rule; and (3) whether the trial court excessively sentenced A.D. We take each issue in turn.

- 18 -

¶ 39    The defendant first argues that the State failed to prove him guilty of attempted murder of a peace officer. He claims that Officer David was not the target of the shooting, and that when N.D. and J.D. appeared in the alley and started firing their guns, they were not aware that there was a police officer in the area where they were shooting. A.D. argues that N.D. and J.D. would not have been able to identify Officer David as a police officer considering that: he was standing about 100 feet away, next to an unmarked police vehicle, wearing civilian clothes, and that the word "Police" was on the back of his vest but he was facing towards them. He accordingly asks us to reverse his conviction and remand for resentencing on an attempted murder conviction.

¶ 40    The State has the burden of proving each element of an offense, beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35. When a defendant challenges the sufficiency of the evidence, the proper standard of review is; whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*. A criminal conviction will not be reversed for insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt as to the defendant's guilt. *Id*.

¶ 41    To sustain a conviction for attempted murder of a peace officer, the State must establish, beyond a reasonable doubt, that the defendant: (1) performed an act constituting a substantial step toward the commission of murder; (2) possessed the criminal intent to kill the victim; and (3) knew or reasonably should have known that the victim was a peace officer in the course of performing his official duties. 720 ILCS 5/8–4(a), 9–1(a)(1), (b)(1) (West 2016); *People v. Kidd*, 2014 IL App (1st) 112854, ¶ 28. Only the third element is at issue here, whether the shooters (for whom A.D. was accountable) knew or should have known that Officer David was a peace officer in the course

of performing his official duties.

¶ 42    A.D. relies upon *People v. Infelise*, 32 Ill. App. 3d 224 (1975), in which the defendant's conviction for aggravated assault of a police officer was reversed because the defendant was approached in a public washroom by two off-duty police officers dressed in T-shirts and shorts with handguns in their waistbands and who drove an unmarked private vehicle. However, those circumstances are very different from the ones here where it is undisputed that Officer David was *wearing a bulletproof police vest*. Even if N.D. and D.J. could not see the word "Police" that was on the back of his vest, it is common sense if not common knowledge, that only police officers wear bulletproof police vests with a visible police badge number attached. Further, Officer David was also wearing a gun that was clearly visible. Although Officer David was approximately 100 feet away from the shooters, he testified that it was "sunny" outside and that he was able to easily see what the shooters were wearing, so it necessarily follows that *they* would be able to see what *he* was wearing.

¶ 43    Even assuming *arguendo* that the shooters' original targets were different people in the area, that became a moot point once they *saw Officer David and started firing shots at him*. "Firing a gun at a person supports the conclusion that the person doing so acted with the intent to kill." *People v. Brown*, 341 Ill. App. 3d 774, 781 (2003). It is also irrelevant that the shooters did not actually hit Officer David. We note that they *did not hit anybody at all*. Being a poor shot is not a valid defense.

¶ 44    Viewing the evidence in the light most favorable to the State and taking into account all the circumstances in which N.D. and J.D. saw Officer David -- a man wearing a bulletproof police vest with a police badge attached to the vest, as well as a clearly visible gun -- under the

circumstances of this case, any reasonable person should and would have been able to identify him as a police officer. See *People v. Ruiz*, 312 Ill. App. 3d 49, 58 (2000) (the state of mind necessary for conviction in an attempted murder of a peace officer is a lower standard, namely that the defendant knew *or should have known* the victim was a police officer). Thus, the shooters for whom A.D. was accountable, *knew or should have known* that Officer David was a police officer when they fired their guns at him. Accordingly, we find that the State proved A.D. guilty of attempted murder of a peace officer beyond a reasonable doubt. His conviction is therefore affirmed.

¶ 45 Next, A.D. argues that Officer David's testimony regarding the vehicle depicted in the surveillance video violated the personal knowledge rule of evidence and so the trial court erred in allowing Officer David's testimony regarding the vehicle. In particular, A.D. takes issue with Officer David's identification of the vehicle seen in the video clips circling the area just before the shooting. According to A.D., the trial court allowing Officer David to identify the vehicle in the surveillance video clips as the same vehicle that A.D. was driving is prejudicial to him since his defense was that he did not drive the shooters to the scene. He asserts that Officer David's testimony violated the personal knowledge rule and asks us to remand his case for a new trial on that basis.

¶ 46 The personal knowledge rule provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Illinois Rule of Evidence 602 (eff. January 1, 2011); *People v. Wesley*, 2019 IL App (1st) 170442, ¶ 23. In other words, while a witness may testify to his observations or sensory perceptions, he generally may not give his opinions or interpretations of those observations. *People*

*v. McCarter*, 385 Ill. App. 3d 919, 934 (2008). The admission of evidence is reviewed under an abuse of discretion standard. *People v. Frazier*, 2019 IL App (1st) 172250, ¶ 26. "An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would agree with the position adopted by the trial court." *Id.*

¶ 47    Here, A.D. claims that Officer David was allowed to repeatedly identify the vehicle seen circling the area a few minutes prior to the shooting, as the same red Nissan SUV which he saw the shooters enter after the shooting. However, the trial court made clear that it was allowing Officer David to testify that he observed the vehicle in the surveillance video clips to be a red Nissan SUV that *looked just like the one he saw* A.D. driving with the shooters. In fact, each time the State asked the question, Officer David added language to his answer which made it clear that he was testifying that the vehicle in the surveillance video "looked similar" to the one in which he had observed the shooters drive away. Additionally, this was a bench trial and the court made it clear that *the court* would be deciding whether it was actually the same red Nissan SUV that A.D. was driving. The trial court explicitly stated on the record: "I will let this officer testify that it is a red Nissan Murano. Obviously, it will be up to the Court to decide whether or not it was the same one that was in the alley." Thus, the trial court sustained A.D.'s objections to Officer David testifying that it was the same vehicle, and only allowed him to testify that it *looked like* the same vehicle. The record shows that the trial court drew its own inferences, based on all the circumstantial evidence, in finding that the red Nissan SUV in the surveillance footage was the same red Nissan SUV that A.D. was driving.

¶ 48    It does not violate the personal knowledge rule to allow witnesses to testify to *their observations*, so long as they do not provide their own interpretation of those observations. See

*People v. Richardson*, 2013 IL App (2d) 120119, ¶ 10 (if the opinion is based on the witness' personal observation, is one that a person is generally capable of making, is helpful to a clear understanding of an issue at hand, and does not provide a legal conclusion, it may be admitted). Since the trial court allowed Officer David to testify that, based on his observation, the vehicle seen in the surveillance footage prior to the shooting appeared to be a red Nissan SUV similar to the one he saw in the alley, but the trial court did not accept any testimony from him that it was the *same red Nissan SUV*, it did not abuse its discretion in allowing such testimony. We thus reject A.D.'s argument.

¶ 49    Finally, A.D. challenges his 20-year sentence. His argument is two-fold: (1) that the trial court misapprehended the applicable sentencing range; and (2) that the trial court failed to consider all mitigating factors in rendering its sentence. A.D. claims that, because he was a juvenile when he committed the offenses, the sentencing code permitted the trial court to apply any sentence in the Class X range. He argues that the trial court misapprehended the law and believed it was bound to sentence him to a minimum of 20 years, but that, pursuant to section 5-4.5-105(b) of the Code, the court had the discretion to sentence him based on a lesser charge, such as attempted murder, which has a minimum of 6 years' imprisonment. According to A.D., had the trial court "properly understood the sentencing scheme, there is no doubt [it] would have exercised [its] discretion and lowered A.D.'s sentence," since it found the "bare minimum" sentence was appropriate. A.D. also argues that, notwithstanding his other arguments, the trial court sentenced A.D. to an excessive sentence because it did not consider all the mitigating factors, such as the circumstances of the offense, his mental health issues, and his potential for rehabilitation. A.D. asks this court to either reduce his sentence or remand the case for a new sentencing hearing.

¶ 50    It is well established that a trial court has broad discretionary authority in sentencing a criminal defendant, and that a reviewing court generally shows great deference to a trial court's sentencing decision since it is in a better position to decide the appropriate sentence." *People v. Bowman*, 2012 IL App (1st) 102010, ¶ 72. Consequently, this court will not overturn a trial court's sentencing decision absent an abuse of discretion." *Id.* If the sentence imposed is within the proper statutory range, it will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or is clearly disproportionate to the circumstances of the offense. *Id.*

¶ 51    We first address A.D.'s claim that the trial court misapprehended the proper sentencing range and did not realize that it had the discretion to sentence A.D. in accordance with a lower Class X offense. He bases his argument on section 5-4.5-105(b) of the Code, which provides the following, in part, for sentencing individuals who were under 18 years old at the time of their offense:

> "[T]he court may sentence the defendant to any disposition authorized for the class of the offense of which he or she was found guilty as described in Article 4.5 of this Code, and may, in its discretion, decline to impose any otherwise applicable sentencing enhancement based upon firearm possession, possession with personal discharge, or possession with personal discharge that proximately causes great bodily harm, permanent disability, permanent disfigurement, or death to another person."
>
> 730 ILCS 5/5-4.5-105(b) (West 2016).

A.D. claims that the legislative intent of this sentencing provision was to give trial courts the discretion to sentence a defendant who has been found guilty of a Class X felony, to a period of

- 24 -

imprisonment authorized for any Class X offense. Yet, A.D. did not provide any authority in support of his claim, and this court did not find any. The plain reading of section 5-4.5-105(b) does not indicate that the legislature intended to give trial courts the discretion to sentence a defendant in accordance with a different offense other than the one for which he was convicted. See *People v. Rinehart*, 2012 IL 111719, ¶ 24 (the plain language of the statute is the best indication of legislative intent). Rather, the plain reading of the sentencing provision at issue provides that trial courts have the discretion to not impose sentencing enhancements for juveniles, such as the firearm enhancement. *People v. Luna*, 2020 IL App (2d) 121216-B, ¶ 28. Notably, the trial court here *did* decline to impose the firearm enhancement. Thus, we reject A.D.'s argument that the trial court misapprehended the proper sentencing range.

¶ 52    We additionally reject A.D.'s argument that the trial court failed to consider all the mitigating factors in sentencing him. In sentencing juveniles, trial courts must consider additional factors associated with youth, including the juvenile's home environment, any outside pressure, and potential for rehabilitation. 730 ILCS 5/5-4.5-105(a) (West 2016). The record shows that the trial court *did* carefully and *explicitly* consider such mitigating factors in this case. In imposing A.D.'s sentence, the trial court spoke at length about A.D.'s age and childhood trauma, as well as the circumstances of the offense and A.D.'s participation. Nevertheless, the trial court is not required to verbalize or articulate each and every factor that it considers in rendering a sentence. Further, by articulating some factors, that does not mean that those were the only factors the trial court considered nor does it mean that it did not take *all* of the important and relevant factors into account. See *People v. Jones*, 2019 IL App (1st) 170478, ¶ 54 (when mitigating factors have been presented to the trial court, it is presumed the court considered those factors, absent some

indication to the contrary). Simply put, the record on appeal negates A.D.'s argument that the trial court did not take the relevant mitigating factors into consideration in determining his sentence. This is especially true considering that the trial court sentenced him to the *minimum* sentence within the sentencing range for the crime of which he was convicted. See *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46 (when a sentence falls within the statutory guidelines, it is presumed to be proper). Accordingly, we find that the trial court did not impose an excessive sentence on A.D. and we affirm his sentence of 20 years' imprisonment.

¶ 53                                 CONCLUSION

¶ 54    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 55    Affirmed.