2023 IL App (1st) 192174-U

No. 1-19-2174

SIXTH DIVISION
March 31, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|---|---|---|
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 14937 |
| | ) | |
| | ) | |
| RAYMOND HOMOLKA, | ) | Honorable |
| | ) | Kevin Sheehan, |
| Petitioner-Appellant. | ) | Judge Presiding. |

JUSTICE TAILOR delivered the judgment of the court.
Presiding Justice Mikva and Justice Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant was proven guilty beyond a reasonable doubt. The trial court did not abuse its discretion in denying his request to wear civilian clothing.  His sentence is not excessive.  His sentence under count seven is vacated and the conviction under count seven is merged with count eight. Mittimus corrected.

¶ 2    Following a bench trial defendant, Raymond Homolka, was convicted of two counts of the first-degree murder of his wife, Mary Lou Homolka, and was sentenced to 60 years' imprisonment. Homolka appeals and argues: (1) his convictions violate the one-act, one-crime rule; (2) the State failed to prove him guilty beyond a reasonable doubt; (3) the trial court abused its discretion in denying his request to wear civilian clothes; and (4) his sentence is excessive. For the following reasons, we affirm Homolka's conviction under count eight, vacate his sentence under count seven, and merge his conviction under count seven into count eight.

¶ 3                                 I.  BACKGROUND

¶ 4    Prior to trial, defense counsel requested that Homolka be able to wear civilian clothes during the trial to avoid the discomfort of wearing jail clothing. The trial judge denied this request finding that the opportunity to wear civilian clothes is not meant for comfort, but rather to prevent a jury from knowing whether Homolka was in custody. Because this case was a bench trial, the trial judge was aware of Homolka's incarceration, so it would not matter what type of clothing he was wearing when he testified.

¶ 5    At trial, the State called Steven Hempel, Mary Lou's son. Hempel identified Homolka in open court as the man his mother married in 1992. Hempel testified that Mary Lou and Homolka slept in separate rooms. Mary Lou slept on the upper level of the house and Homolka in the basement. Hempel last spoke to Mary Lou via text message on Sunday February 4, 2017. He received a text from his aunt on Thursday, February 9, 2017, informing him that Mary Lou had missed two days of work, and no one could get in contact with her. Hempel attempted to call Mary Lou, but her phone went straight to voicemail, which concerned him.

¶ 6    Hempel contacted Homolka to inquire about Mary Lou's whereabouts.  Homolka claimed

he did not know where Mary Lou was and had not seen her since the previous Sunday evening. Hempel testified that Homolka stated that Mary Lou had been talking about going to Las Vegas and she might be there with one of her friends. After this conversation, Hempel contacted the Orland Park Police Department and asked for a well-being check to be performed. A police officer was sent to the house but did not report anything out of order. Hempel contacted Homolka again and told him that if Mary Lou did not turn up by the next morning, Friday, February 10, 2017, that he was going to file a missing person's report.

¶ 7     Hempel went to Mary Lou and Homolka's residence on Friday. Hempel again questioned Homolka as to Mary Lou's whereabouts and Homolka insisted he did not know where she was. While Hempel was at the residence, police officers and detectives from the Orland Park Police Department arrived. Homolka was cooperative and was being helpful. Hempel testified that after searching the garage, one of the officers returned inside with his gun drawn. Hempel was escorted out of the house and later learned that the officers had found his mother's body in the garage.

¶ 8     Mark Hughes, Mary Lou's brother, testified that Mary Lou worked for him on Tuesdays and Thursdays and the last time he saw her alive was on February 2, 2017, when she left work. When she did  not show up to work as expected on Tuesday, February 7th, Hughes sent her a text asking her if she was coming to work. When Mary Lou did not respond to that text message, Mark called her. Mary Lou did not answer or return his call.

¶ 9     Mark spoke with his other sister Jennifer, and they agreed that if Mary Lou did not come into work on Thursday, then they would contact her son. When Mary Lou did not show up to work again on Thursday, February 9th, Mark testified that Jennifer contacted Hempel and they

began trying to find Mary Lou. The next day, Friday, February 10th, Mark met Hempel at the Orland Park Police Department to file the missing person's report. Mark testified that later that day he was informed that Mary Lou's body was discovered in her garage.

¶ 10     Gregory Hughes, Mary Lou's older brother, testified that on Friday, February 10, 2017, he received a text from his sister Jennifer that his other siblings were concerned as they had not been able to get in contact with Mary Lou. Gregory contacted Homolka to inquire about Mary Lou's whereabouts. Gregory testified that Homolka claimed he had no idea where Mary Lou had gone as she had not been answering his calls. He mentioned that she may have gone to Las Vegas with a woman named Gina. Gregory attempted to call Homolka again, but he did not answer. A few hours later, Gregory learned that Mary Lou was found dead in her house.

¶ 11     John Friel testified that on Sunday, February 5, 2017, he served Homolka and Mary Lou brunch at Granite City in Orland Park. Friel testified that Homolka seemed a little irritated, but Mary Lou had calmed him down. Friel testified that the couple did not argue.

¶ 12     Julius Prokop testified that he knew Homolka and Mary Lou, as they lived across the street from him. Prokop testified on Thursday, February 9, 2017, at around 1:30 p.m., he was pulling his car into his driveway when he saw Homolka outside his home next to a vehicle with an extension cord in the engine, running into Homolka's backyard. Prokop thought it was unusual for Homolka to be running the extension cord into the backyard because there was an outlet right inside the garage door, which was closed. When Prokop came back outside 30 minutes later, Homolka was no longer outside.

¶ 13     Jose´ Torres testified that he was employed at Maryland Pig, a scrap metal yard where Homolka was the boss. Torres testified that he was working the week of Monday, February 6,

2017, and Homolka did not come in that entire week. Torres claimed this was odd because Homolka typically never took a day off. Torres also testified that he spoke with Homolka on the phone every day that week and on Thursday, February 9, 2017, Homolka asked him to come help jump start his car at his house. Torres testified that he never went into the house that day and did not see Mary Lou around.

¶ 14    Michael Stanford, another employee at Maryland Pig testified that he typically picked Homolka up on his way to work every morning because Homolka did not have a valid driver's license.  On Monday, February 6, 2017, Homolka called him and said he was not coming into work, so he did not need a ride. Stanford also testified that about two weeks before Mary Lou's death, Homolka had made a comment about not looking forward to going home but did not go into detail as to why.

¶ 15    It was stipulated that Mary Lou's sister, Carol Watt, would testify that she worked with Homolka at Maryland Pig for 17 years. Carol would testify that she had not seen Homolka since Friday, February 3, 2017, which was extremely uncharacteristic of him as he never called in sick.

¶ 16    It was stipulated that Orland Park Police Officer Charles Kirby would testify that he was assigned to do a well-being check on Mary Lou on Thursday, February 9, 2017. Officer Kirby spoke with Homolka at their residence.  Homolka claimed Mary Lou was gone but he was not concerned because she had done things like this in the past. Officer Kirby looked through the house with Homolka and noted numerous scented candles lit on the lower and main levels of the home. Officer Kirby looked in the garage but did not note anything out of the ordinary. He did not look inside either the garbage or recycling can inside the garage.

¶ 17    Orland Park police officer Anthony Carone testified that on Friday, February 10, 2017, he

was assigned to check the well-being on Mary Lou at Homolka's residence. Officer Carone testified that Homolka opened the door and claimed he had not heard from Mary Lou since the previous Sunday, and believed she was in Las Vegas. This conversation between Officer Carone and Homolka only lasted 2 minutes.

¶ 18    Orland Park police sergeant David Ziolaowski testified that on Friday, February 10, 2017, he was the detective assigned to follow up on the missing person report filed by Mary Lou's family. Sergeant Ziolaowski testified that he and two other detectives drove to Homolka's residence and when they arrived, Homolka invited them inside. Sergeant Ziolaowski had a conversation with Homolka about Mary Lou's whereabouts. Sergeant Ziolaowski testified that Homolka told him on Sunday, February 5, 2017, he had gone to Granite City with Mary Lou, then went grocery shopping and came back home. Homolka further explained that once they got home, he went to the basement and laid on the couch until the Super Bowl started, but he fell asleep. Sergeant Ziolaowski testified that Homolka told him he did not interact with Mary Lou when he woke up the following morning and did not realize that she was not in the home until that evening.

¶ 19    Sergeant Ziolaowski testified further that Homolka explained that Mary Lou had been talking about wanting to go to Vegas for several weeks, so she must have gone there with her friend, Gina. The other detectives questioned Homolka about luggage that Mary Lou would have taken with her, but Homolka claimed Mary Lou would not have taken anything with her had she gone but would have just bought what she needed when she got there. Sergeant Ziolaowski testified that he inquired about the car Mary Lou drove and Homolka offered to show it to them in the garage. Sergeant Ziolaowski stayed back with Homolka while the others went to search the

garage. Sergeant Ziolaowski testified that Detective Dangles came back into the house and handcuffed Homolka before going back outside. Sergeant Ziolaowski asked Homolka what the other officers could have found, and Homolka told him it was probably Mary Lou. After Homolka was transported to the police station, Sergeant Ziolaowski learned that Mary Lou's body had been found in the recycling bin in the garage.

¶ 20    People's Exhibit 13 was a photograph looking straight down into the bin, showing "the body of [Mary Lou] with her head down and her feet bent in 90 degrees folded into the recycling bin," which was the position in which Ziolaowski saw her body when he first observed it. There was a "large pooling of blood" around her buttocks area and a green handle from a short mop coming up from between her legs.  When Mary Lou's body was removed from the bin, Ziolaowski was present, and he saw that the top half of her body was covered with a black or brown garbage bag wrapped around her upper torso. The outside edges of her feet and calves appeared to have dried blood on them, and her buttocks and lower back region had "large poolings of still wet blood."

¶ 21    Retired Orland Park police detective Chris Dangles testified for the State that he was among the group of officers assigned to investigate Mary Lou's disappearance. Detective Dangles testified that the Homolka gave him permission to look around the house. Homolka had told the detectives that he thought Mary Lou could be in Vegas with a friend, but detective Dangles found no indication that Mary Lou had left on a trip because her toiletry bag and makeup was still in the house.  Detective Dangles also testified that he immediately smelled a strong odor of bleach in the subbasement of the house.

¶ 22    Detective Dangles inquired as to the whereabouts of Mary Lou's car, which Homolka

told him was still in the garage. Detective Dangles testified that Homolka was present in the garage as the detectives looked around, but eventually said he was cold and went back into the house. Detective Dangles testified that he found Mary Lou's purse and ID in her car. As he was closing the trunk of the car, Detective Dangles testified that he noticed some oddly shaped bags near the garage and recycling cans. Detective Dangles testified that he opened the recycling bin and noticed what he believed to be a female body stuffed inside. After this discovery, Detective Dangles testified that he went back into the house and told Homolka to put his hands where he could see them, but Homolka did not oblige.

¶ 23    Orland Park Police Detective James Grimmett testified that he was assigned to the case after Mary Lou's body was discovered on Friday, February 10, 2017. Detective Grimmett testified that he interviewed Steven Hempel, Mark Hughes, and Gregory Hughes before he went to Homolka's residence to participate in the search of the home. In the basement, Detective Grimmett testified that he saw paper towels with dried blood on them and blood stains on the ceiling. Detective Grimmett also testified that he recovered a .40 caliber, semiautomatic firearm in the basement that was missing one round of ammunition.

¶ 24    The parties stipulated that Dr. Latanja Watkins was qualified as an expert in the fields of pathology and forensic pathology and would testify that she was an assistant medical examiner for Cook County who performed an autopsy on Mary Lou's body to determine her manner of death. Watkins noted an entrance gunshot wound on the left side of Mary Lou's forehead and recovered one deformed metal-jacketed projectile from the body. Watkins concluded that Mary Lou was the victim of homicide and died as the result of a single gunshot wound to the head. Forensic testing established that the bullet found in Mary Lou's body came from the gun

recovered in their basement.

¶ 25    Homolka testified that he acted in self-defense when he shot Mary Lou because he was under the mistaken belief that an intruder was in his home in the middle of the night. Homolka stated that he and Mary Lou went shopping and to brunch at Granite City around noon, but he started to feel ill, so Mary Lou took him home where he went to sleep around 1 p.m. Homolka drifted in and out of sleep until he woke up around 3 a.m. because he heard the sliding door open. Homolka testified that he became worried that someone was in the house because Mary Lou had told him about two home invasions a few weeks earlier. When he heard the door close again, Homolka testified that he went upstairs with his .40 caliber pistol.

¶ 26    Once he was upstairs, Homolka testified that he could see Mary Lou's bedroom door was open. Homolka went to the sliding door to see if he could notice anyone. When he looked outside, he could see the safety locks on the inside of the side gate were unlocked but he did not see anyone. Since he did not see any movement, Homolka testified that he went to leave the kitchen when he was grabbed from behind and pulled down by a hand on his neck. Homolka then raised his gun over his head and fired one shot. After firing the shot, Homolka claimed he felt the person's grip on him release and he ran to the office on the lower level of the house to hide.

¶ 27    Homolka testified that he waited two hours before returning to check on things upstairs. When he came back upstairs, he saw Mary Lou's body on the kitchen floor. Homolka claimed he was in shock, overwhelmed, throwing up, and did not know what to do. Homolka got the recycling bin, which he brought into the kitchen, and put Mary Lou's body in it.  He then went back to sleep on the couch for about two hours. When he awoke, he put the bin in the garage and

mopped up the blood on the kitchen floor, which had pooled on the floor and flowed toward the closet in the kitchen. He used "maybe a dozen" rolls of paper towels to clean up the blood and put the bloody paper towels in plastic bags. He put the mop in the recycle bin with Mary Lou's body. Homolka claimed he did not call the police because he was concerned with the length of time between when he believed he shot an intruder and once he realized he had killed Mary Lou.

¶ 28    Homolka called into work on Tuesday and Wednesday and said he would not be there. On Thursday, he received several phone calls, all asking about Mary Lou, but he did not tell any of the people who called what had happened to her. Instead, he told them that Mary Lou "could have [gone] to Las Vegas."

¶ 29    Homolka spoke with police when they were at the house on Thursday but did not tell them what had happened to Mary Lou. On Friday, Hempel and police arrived at the house around noon and Homolka allowed them to look around and opened the garage door for them. After Homolka went back in the house, one of the detectives or officers came in and told him to put his hands up and that he was under arrest. He agreed to go to the police station to answer questions, but when he was at the station, he still did not tell anyone what had really happened to Mary Lou. He did not tell anyone-the police, family members, or his attorney-what really happened on the night of Mary Lou's death.

¶ 30    On cross examination, Homolka testified that he and Mary Lou had an agreement about not calling the police, which they made after the last time she called the police. When questioned if this agreement was the reason he did not call the police after he discovered he killed Mary Lou, he clarified that he did not call because he was confused on what the best thing was to do. On redirect, Homolka clarified that he did not believe it was Mary Lou behind him and he would

have never pulled the trigger had he known it was her. The trial court found Homolka guilty of all eight counts of first-degree murder, finding specifically that self-defense has been disproven beyond a reasonable double. The trial court denied Homolka's motion for a new trial, noting that Homolka's failure to tell anyone of his account of self-defense until after discovery was complete suggested that Homolka wanted to craft a story of self-defense.

¶ 31     On each of two counts of first-degree murder, the trial court sentenced Homolka to 35 years plus an additional 25 years for the personal discharge of a firearm that proximately caused death, for a total of 60 years to run concurrently. The trial court denied Homolka's motion to reconsider the sentence.

¶ 32     This appeal followed.

¶ 33                              II. ANALYSIS

¶ 34     Before we address the merits of Homolka's claims, we address Homolka's one-act, one-crime argument. Homolka argues, and the State agrees, that his convictions for two counts of first-degree murder on counts seven and eight should merge into a single count where the conduct underlying his convictions, as charged, stemmed from the same act of shooting and killing Mary Lou (see *People v. King*, 66 Ill. 2d 551, 556 (1977) (a criminal defendant may not be convicted of multiple offenses when those offenses are all based on precisely the same physical act)).

¶ 35     Here, the first-degree murder charges were all premised on the singular act of Homolka shooting and killing Mary Lou. The court imposed identical, concurrent sentences of 35 years plus 25 years where Homolka personally discharged a firearm proximately causing Mary Lou's death. Therefore, we vacate Homolka's conviction under count seven for first-degree murder,

and merge count seven into count eight. Homolka's conviction and 60-year sentence on count eight remains unchanged.

¶ 36    Homolka next argues that his conviction for first-degree murder should be reduced to second-degree murder because he "demonstrated that he had a subjective, though unreasonable, belief that he needed to fire his gun to repel an intruder in his home." He argues that although he knew that his wife was home at the time he fired the shot, when he felt someone grab him from behind, he believed that person to be an intruder.

¶ 37    For a person to be guilty of first-degree murder, the State must prove the Homolka killed an individual by performing acts that were intended to kill, do great bodily harm, or create the strong possibility of death or great bodily harm and that the Homolka committed those acts without lawful justification. 720 ILCS 5/9-1(a) (West 2018).

¶ 38    Second-degree murder is a lesser-mitigated offense of first-degree murder. *People v. Wilmington*, 2013 IL 112938, ¶ 48. A defendant commits second-degree murder when he commits first-degree murder and, at the time of the killing, one of the following mitigating factors is present: (1) the defendant was acting under an unreasonable belief that the killing was justified; or (2) the defendant was acting under a sudden and intense passion resulting from serious provocation by the individual killed but the defendant negligently or accidentally caused the death of the individual. 720 ILCS 5/9-2(a) (West 2010). To reduce first-degree murder to second-degree murder, the defendant must prove the existence of one of those mitigating factors by a preponderance of the evidence. *People v. Manning*, 2018 IL 112081, ¶ 18 (citing *People v. Jeffries*, 164 Ill. 2d 104, 114 (1995)). Once the defendant has proven a mitigating factor by preponderance of the evidence, the burden shifts back to the State, who must disprove the factor

beyond a reasonable doubt. *People v. Thompson*, 354 Ill. App. 579, 587 (2004).

¶ 39    Whether a defendant is guilty of first-degree murder or second-degree murder is a question for the finder of fact. *People v. Simon*, 2011 IL App (1st) 091197, ¶ 52. The finder of fact, in this case the trial court, is responsible for determining the credibility and weight of witness testimony, resolving conflicts and inconsistencies in that testimony, and drawing reasonable inferences from the evidence. *Id.* When reviewing a defendant's argument that he presented evidence to prove the existence of a mitigating factor, the reviewing court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the mitigating factors were not present." *People v. Blackwell*, 171 Ill. 2d 338, 358 (1996); *People v. Bennett*, 2017 IL App (1st) 151619, ¶ 43.

¶ 40    Homolka failed to establish the existence of a mitigating factor in this case.  The evidence presented at trial established that on February 10, 2017, Homolka shot and killed Mary Lou in their home. The evidence further showed that Homolka used his gun to kill Mary Lou, and that her blood was on his clothing, the floor and ceiling joists of the home.  It was further established that Mary Lou was not shot at close range and the bullet that killed Mary Lou traveled from left to right and downward, contradicting Homolka's version of shooting over his shoulder at an intruder that was grabbing him from behind.  After Homolka murdered Mary Lou, he then stuffed her body in a recycling bin and placed it in the garage until her body was found by police several days later.  During that time, Homolka continually lied to Mary Lou's family and to police about her whereabouts, even concocting a story that Mary Lou had gone to Las Vegas with a friend, all the while knowing that her body was decomposing in the recycle bin in the garage and attempting to cover the smell with scented candles and bleach.

¶ 41    Here, the trial judge "specifically [found] that there is no self-defense, that this has been disproven beyond a reasonable doubt, that there is no second-degree murder in here, that has not been established, that the Homolka's story does not match." The court noted that there was "no evidence that he was in shock," and that defendant's "actions were deliberate throughout that period of time. Each lie feeding on the next one." The court further found that defendant's description of the events surrounding Mary Lou's murder did not match the physical evidence in the case at all and that Homolka's "credibility [was] nil to none based upon his record of truthfulness throughout everything that occurred in the case," including that defendant "[lied] to everybody. He stuff[ed] his wife in a garbage can. He clean[ed] up the blood. He [hid] the murder weapon. He [sent] police and family on wild goose chases to find other people [Mary Lou] went to Vegas with."  Finally, despite claiming he was in shock, Homolka went to sleep for two hours after he placed Mary Lou's body in a recycling bin.

¶ 42    Viewing the evidence in the light most favorable to the State, we find that the State proved beyond a reasonable doubt that Homolka committed first degree murder.  We further find that not only did Homolka fail to establish a mitigating factor by a preponderance of the evidence, but the evidence also disproved the existence of a mitigating factor or that the murder he committed was the result of self-defense.  Consequently, Homolka's conviction for first degree murder is affirmed.

¶ 43    In further support of his argument that his conviction should be reduced to second degree murder, Homolka contends that the trial court erroneously relied on his post-arrest silence to determine his credibility. Homolka testified on direct examination as part of his case in chief that he did not tell anyone what had happened the night he killed Mary Lou until after discovery was

closed in this case, when he told his attorney. This testimony was offered by Homolka in support of his defense of self-defense. On cross-examination, the State inquired why Homolka had not shared his exculpatory version of events when he was interviewed by police. The State then played a four-minute conversation Homolka had with detectives at the Orland Park Police Department where he explained what he and Mary Lou had done on Sunday, February 5, 2017. Homolka did not say anything about Mary Lou's death or shooting an alleged intruder.

¶ 44    The State responds that Homolka failed to object at trial and therefore waived any objection to this testimony.   See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988).  Homolka does not acknowledge this forfeiture or ask this court to recognize it as plain error.  Where a defendant fails to argue that the evidence was closely balanced or explain why the error is so severe that it must be remedied to preserve the integrity of the judicial process, he forfeits plain error review. *People v. Nieves*, 192 Ill. 2d 487, 502-03 (2000). We therefore honor this forfeiture and will not consider any claim that this evidence was not admissible.  Indeed, Homolka does not make any argument that admission of this evidence was a trial error. Rather, he argues post-arrest silence only in the context of his claim that the evidence was not sufficient to sustain his first-degree murder conviction.

¶ 45    To the extent that Homolka relies on the trial court's possible consideration of this silence as undermining the sufficiency of the evidence for first-degree murder, we disagree. Not only did the court find Homolka to be incredible, but it also specifically stated that it did not rely on Homolka's post-arrest silence in finding him guilty. Homolka's conviction for first degree murder was based on the substantial evidence that undermined his claim of self-defense, which included physical evidence, and testimonial evidence subject to the trial court's credibility

determinations. Thus, there was no reasonable probability that the outcome of Homolka's trial would have been different if the trial court had not been made aware of his post-arrest silence.

¶ 46    Next, Homolka contends he was denied a fair trial when the trial court rejected his request to wear civilian clothing when he testified, which he argues affected his credibility. Specifically, Homolka asked the court to wear civilian clothing, not because he thought jail attire would be prejudicial to his case, but because he wanted to be comfortable during his testimony. We also note that the record contradicts Homolka's claim that he "made his request to wear civilian clothes so that he could best present his defense and avoid the negative psychological effects of jail clothing." The record clearly states that Homolka was requesting to wear civilian clothing so he "would feel more comfortable, because he may be on the stand for a couple of hours or more." At no time was there a discussion of any purported negative psychological effects in wearing jail attire.

¶ 47    Homolka acknowledges that he forfeited this issue by failing to include this argument in his posttrial motion. *Enoch*, 122 Ill. 2d at 186. However, he asks us to review the trial court's denial of his request to wear civilian clothing for plain error. Under the plain error doctrine, we may grant defendant relief based on an unpreserved claim of error where a clear and obvious error has occurred and either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). The first step in plain error review is to determine whether an error occurred.

¶ 48    It is well established that a defendant's due process rights are violated when the court compels him to appear before the jury in jail clothing. See *People v. Wilkes*, 108 Ill. App. 3d 460,

16

467 (1982). We have also recognized that "trial courts should exercise discretion in considering a defendant's request for witnesses to testify before a jury in civilian clothing to prevent any unnecessary prejudice." *People v. Bowman*, 2012 IL App (1st) 102010, ¶ 62. The denial of a request by a defendant to wear civilian clothing at a jury trial is subject to abuse of discretion. *Id.* No Illinois court has held either explicitly or implicitly, that prejudice results when a trial court fails to allow a defendant to obtain and wear civilian clothing for the duration of a bench trial.

¶ 49    This was a bench trial. The trial court was the trier of fact and found, "[t]he reason for civilian clothes *** is not a comfort factor for people. *** [T]his is a bench trial, and obviously I'm aware of what your present state is and I won't consider that one way or another in arriving at my verdict."  The fact that Homolka testified in jail attire was clearly not prejudicial to his case as the court explicitly stated that it would not consider Homolka's attire in determining his guilt or innocence.  We therefore find that the trial court did not abuse its discretion in denying Homolka's request to wear civilian clothing during his bench trial.  The fact that Homolka preferred to testify in more comfortable clothing is not relevant to our analysis here.  We find that no error occurred, and plain error analysis is unnecessary.

¶ 50    Finally, Homolka argues that the trial court abused its discretion in sentencing him to a total of 60 years' imprisonment because it "improperly used serious harm and a criminal record of misdemeanor and traffic offenses in aggravation."  The State maintains that Homolka forfeited the issue for purposes of review because he did not raise a contemporaneous objection at the sentencing hearing or in a post-sentence motion and urges us to find that Homolka did not meet the required plain error standard.

¶ 51     To preserve a claim of sentencing error, a defendant must raise a contemporaneous objection and file a written post-sentencing motion raising the same issue. *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). Failure to properly preserve the issue will result in forfeiture of that issue on appeal. *People v. Enoch*, 122 Ill. 2d 186-87 (1988).  Plain error review is appropriate for non-preserved sentencing errors when 1) the evidence at the sentencing hearing was closely balanced, or 2) the error was so egregious as to deny the defendant a fair sentencing hearing. *Hillier*, 237 Ill. 2d at 545. "The first analytical step under the plain error rule is to determine whether there was a clear or obvious error." *People v. Moon*, 2022 IL 125959, ¶ 22.

¶ 52     A trial court has broad discretionary powers in choosing the appropriate sentence a defendant should receive.  *People v. Jones*, 168 Ill. 2d 367, 373 (1995).  A reasoned judgment as to the proper sentence to be imposed must be based upon the particular circumstances of each individual case and depends upon many factors, including the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age.  *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977).  "In determining an appropriate sentence, the defendant's history, character, rehabilitative potential, the seriousness of the offense, the need to protect society and the need for deterrence and punishment must be equally weighed."  *People v. Jones*, 295 Ill. App. 3d 444, 455 (1998).  The potential for rehabilitation need not be given any greater weight than the seriousness of the offense.  *People v. Sharpe*, 216 Ill. 2d 481, 525 (2005).  There is a strong presumption that the trial court based its sentencing determination on proper legal reasoning, and the court is presumed to have considered any evidence in mitigation that is before it.  *People v. Partin*, 156 Ill. App. 3d 365, 373 (1987).  The imposition of a sentence is a matter within the trial court's discretion, and a reviewing court has the power to disturb the sentence

only if the trial court abused its discretion. *Jones*, 168 Ill. 2d at 373-74. We will find an abuse of discretion only where the court's ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the court. *People v. Hall*, 195 Ill. 2d 1, 20, (2000). We will not disturb a sentence within the applicable sentencing range unless the circuit court abused its discretion. *Id.*

¶ 53    Homolka was convicted of first-degree murder, which carries a sentencing range of 20 to 60 years. 720 ILCS 5/9-1(a)(1) (2017); 720 ILCS 5/9-1(a)(2) (2017); 730 ILCS 5/5-4.5-20(a) (2017). Because Homolka personally discharged a firearm during the commission of the murder and it proximately caused the death of another person, the trial court was required to add an additional 25 years to life to Homolka's sentence. 730 ILCS 5.5-8-1(d)(iii) (2017). The mandatory addition of 25 years to life made the total statutory range for Homolka's sentence 45 years to life.

¶ 54    In determining an appropriate sentence in this case, the trial court carefully considered all the aggravating and mitigating factors.   In sentencing Homolka, the court stated:

> "In deciding this case, I think I spoke abruptly and truthfully as to what I believe the facts of the case showed that found [defendant] guilty of the first degree murder charges in this case. When I did so, I believed that the evidence established against him, not only established that he was the individual who pulled the trigger that killed the victim in this case, but also that [he] did so in a calculated way.
>
> He took advantage of not only her, but he did so coldly and brutally. Even if you were to believe the statements he made during the course of this trial, which I did not accept as true and accurate, the actions that he took in relation to his wife to leave her

alone with this intruder in a bedroom upstairs while he sat there with a gun loaded in his basement and not calling the police or doing anything to help his wife, even if I were to accept that, it shows the extreme, cold character and indifference to the life of [Mary Lou], even if I were to believe his story.

I don't believe his story. [Defendant], by the facts and evidence in this case have shown, he pulled the trigger and killed his wife on the night of this homicide and then spent the next week lying to everybody about it, trying to cover up the crime that he had committed.

That being said, I have to consider all the areas of mitigation and aggravation in the case. I have considered the presentence investigation in this case. I have considered the arguments of counsel. I have considered -- in this case the defendant did not wish to elocute which is his right in this case. I have also considered all of the statutory aggravating and mitigating factors.

Although there are very few that the defendant fits under in the mitigating factors that are known by statute, I do recognize that [defendant's counsel] is correct, a few of those assertions, one, that he did help family members get jobs during the course of their lives. That was at least some times when [defendant] was not drinking that he treated people appropriately; that he used his efforts in order to help people. So I considered those areas of mitigation.

I have also considered the ability to rehabilitate [defendant] as I must, according to the law. In considering that, I also have to consider the statutory aggravating factors in this case that his conduct caused or threatened serious harm, and that he has a history of

prior delinquency of criminal activity that has already been brought out in the presentence investigation, that the sentence here is necessary to deter others from committing the same crime, that the defendant committed this crime against a person 60 years of age or older. So there are a number of aggravating factors in this case.

I have also considered the facts of the case and the aggravating, basically, indifference of the defendant to the plight of his wife throughout the course of hearing all of the evidence in this case. It's staggering, mind-blowing, how little, even if I were to believe the defendant's statement, how little [Mary Lou] meant to him after all of these years of marriage. So when I have heard earlier that this was a solid marriage, without problems, that is not what I see in the case, not by his actions, not by his statements, not by the victim impacts and the witness testimony that I hear today.

I see a cold man, a man that took the life of his wife very lightly, and I have considered all the matters in aggravation and mitigation. In so doing, I'm going to sentence the defendant to what I feel is appropriate based upon the facts of this case."

¶ 55    Homolka argues that it was improper for the court to consider the serious harm to the victim as a factor in aggravation.  Section 5-5-3.2 of the Unified Code of Corrections (Code) provides that a sentencing court may consider certain factors as reasons to impose a more severe sentence, including whether "the defendant's conduct caused or threatened serious harm." 730 ILCS 5/5-5-3.2(a)(1) (West 2018). However, a factor implicit in the offense cannot be used by the sentencing judge in aggravation to justify a more severe sentence than might otherwise be imposed. *People v. Saldivar*, 113 Ill. 2d 256, 266-67 (1986) (citing *People v. Conover*, 84 Ill. 2d

400, 404 (1981)). Serious harm is inherent in the offense of murder. *Saldivar*, 113 Ill. 2d at 271.

¶ 56 Contrary to Homolka's argument, it is not entirely clear from the record that the court was considering the serious harm done to Mary Lou as a factor in aggravation. The court merely stated that "I also have to consider the statutory aggravating factors in this case that his conduct caused or threatened serious harm." Section 5-5-3.2 allows a court to consider the serious harm caused to people other than the victim and certainly Mary Lou's family members and friends were seriously harmed because of her murder. See *People v. Brown*, 2019 IL App (5th) 160329, ¶ 22 ("Section 5-5-3.2(a)(1) does not state that the serious harm to be considered is restricted to the serious harm to the victim, and we decline to judicially recraft the plain language of the section"); see also *People v. Kelley*, 2019 IL App (4th) 160598, ¶ 11 ("By contrast, the grief of surviving family members, though a common result of murder, is not implicit in murder itself. The murder victim might have no family, or the family might be indifferent. A deleterious effect on the murder victim's family is a frequent consequence of murder, not something inherent in murder itself.")

¶ 57 Even if the court's comment could be construed as referring to the serious harm done to Mary Lou, the court's comment was general in nature and made in passing. In *People v. Brewer*, 2013 IL App (1st) 072821, the defendant argued that the trial court erred when it considered a factor inherent in the offense of murder when sentencing him. The court stated, "Factors in aggravation, the defendant's conduct did cause or threaten serious harm, the ultimate serious harm, murder." *Id.* ¶ 56. We found no abuse of discretion where the defendant's sentence was well within the statutory range for first degree murder, holding:

"The record does not indicate the trial court emphasized a factor inherent in the offense during sentencing. Contrary to [defendant's] assertions, the fact his conduct threatened or caused serious harm is not a factor inherent in the crime itself but is a proper aggravating factor to be considered during sentencing even in cases where serious bodily harm is implicit in the offense." *Id.* ¶ 57 (citing *People v. Saldivar*, 113 Ill. 2d 256, 269 (1986). *People v. Solano*, 221 Ill. App. 3d 272, 274 (1991), and *People v. Spencer*, 229 Ill. App. 3d 1098, 1102 (1992)).

¶ 58    Similarly, in *People v. Beals*, 162 Ill. 2d 497 (1994), the defendant argued that after his conviction of first-degree murder, he was deprived of a fair sentencing hearing when the trial court improperly relied on the victim's death as an aggravating factor when the victim's death was inherent in the offense of murder.  During sentencing, the court stated:

"In aggravation the first guideline indicated in the statute is 'whether the conduct of the defendant caused or threatened serious harm.' Well, we all know that your conduct caused the ultimate harm. It caused the loss of a human life." *Id.*

¶ 59    Our supreme court held that the trial court never considered the victim's death as an aggravating factor; rather, "the record suggests that the trial court statement was simply a general passing comment based upon the consequences of the defendant's actions." *Id*. The *Beals* court further noted that even if "the trial court's comment may be construed in the manner that the defendant suggests," it would still affirm his sentence because the record indicated that the trial court had placed little weight on the fact that his conduct caused the victim's death and had instead relied on other aggravating factors including the victim's age, the fact that the offense was drug related, the need to punish and deter him and the need to protect society.  *Id*. As such,

23

the court rejected the defendant's argument that the cause should be remanded for resentencing. *Id*.

¶ 60    Similar to the comments made by the courts in *Brewer* and *Beals*, the trial court's passing comment regarding the serious harm caused was an isolated, passing comment made about the consequences of Homolka's actions when discussing the factors in aggravation.  The record establishes that that the trial court did not place any emphasis on the victim's death.

¶ 61    Furthermore, a sentence imposed by the trial court that falls within the prescribed statutory range is considered presumptively proper and will not be disturbed unless it is greatly at variance with the purpose and spirit of the law or is manifestly disproportionate to the offense. *People v. Cabrera*, 116 Ill. 2d 474, 493-94 (1987).  In this case, Homolka was convicted of first-degree murder with a firearm with a 25-year add on for discharging a firearm.  The sentencing range in this case was 45 years to life.  730 ILCS 5/5-4.5-20(a) (2018). Homolka was sentenced to 60 years' incarceration, only 15 years above the mandatory minimum sentence, and accordingly his sentence is presumptively proper. See *People v. Hauschild*, 226 Ill. 2d 63, 90 (2007) (a sentence within statutory guidelines is presumptively valid).  Accordingly, no  error occurred here.

¶ 62    Homolka also faults the trial court for relying on his limited criminal history as a factor in aggravation.  Homolka argues that the trial court improperly considered his prior convictions, which only consisted of misdemeanors: an attempt resisting, battery, a domestic battery and illegal use of fireworks, a disorderly conduct and three misdemeanors for driving under the influence.  He claims that his lack of significant criminal history should have been a factor in mitigation, not aggravation.

¶ 63    Contrary to Homolka's argument, section 5-5-3.2(a)(3) of the Code specifically allows the trial court to consider that "the defendant has a history of prior delinquency or criminal activity" as a factor in aggravation.  730 ILCS 5/5-5-3.2(a)(3) (West 2018).  The trial court was well within its right to consider Homolka's prior misdemeanor convictions in aggravation.  There is no error here and therefore, we decline Homolka's invitation to conduct plain error analysis.

¶ 64                                CONCLUSION

¶ 65    For the foregoing reasons, the judgment of the trial court is affirmed as modified. Homolka's sentence under count 7 is vacated and his conviction under count seven is merged into count eight. Homolka's conviction and sentence under count eight stand.   The mittimus shall be corrected to reflect this holding.

¶ 66    Affirmed as modified.